.Dorothy E. COOPER, Appellant,·

v.

Helen STEEN et al., Appellees.

No: 15434.

Court of Civil Appeals of Texas.

Dallas.

Oct. 24, 1958.

Rehearing Denied Dec. 12, 1958.

O. M. Stubblefield, Dallas, for appellant.

A. J. Piranio and P. P. Ballowe, Dallas, for appellees.

YOUNG, Justice.

Appellant's suit was for cancellation of deed and damages, consequent upon a real estate transaction; alleging fraudulent conduct of defendants in various particulars. After plaintiff had adduced testimony and rested her case, defendants interposed a motion for instructed verdict; which, being sustained, the court withdrew the case from the jury and rendered a judgment for defendants. Such judgment duly excepted to is now presented for review.

Appellees reject the preliminary statements of appellant concerning "nature and result of suit" except as to the fact of defendants' judgment rendered upon motion therefor. Following is a rehash of the material facts underlying this controversy by our own inspection of the record; defendants herein being Helen Steen and Clyde M. Walker.

On February 2, 1955 Clyde M. Walker and wife Huelene, sellers, and Dorothy E. Cooper, purchaser, executed a contract of sale relative to property described therein as "114 & 116 South Ira", Dallas County; more fully described in later conveyances as "All that certain lot, tract or parcel of land situated in Dallas County, being Lots 29, 30 and 31 in Block 20 of Arcadia Park Addition to the City of Dallas, Texas, according to the map thereof recorded in Vol 1, page

377, Map Records of Dallas County, Texas;" said contract further providing "the price is $11,000.00, payable as follows: $1,-000.00 in cash of which purchaser has deposited with Clyde M. Walker, as part payment, the receipt of which is hereby acknowledged by said * * * with the balance of the cash payment to be paid upon final closing; * * *". "This contract is subject to purchaser assuming a loan in the amount of approximate $7,000.00. The seller agrees to carry a second lien note in the amount of $3,000.00; payable $1,000.00 the first year as follows: $500.00 to become due and payable (6) Six Months from date of closing, and $500.00 to become due and payable (1) One year from date of closing— Then the balance at $20.00 per month at 6% interest. The said executed note to be secured by vendor's lien and Deed of Trust with power of sale, and with the usual covenants as to taxes, insurance, and default." The American Title Company of Dallas was agreed upon as the agency for closing of sale.

On date of above contract of sale, the described property was owned by defendant Helen Steen, (Ida Mae McCord having an interest) and Clyde M. Walker was this defendant's real estate agent. It soon developed that Mrs. Cooper could not qualify as maker of the $7,000 loan involved, she having no regular income; the arrangement then being that a sale should first be made by owners (Steen & McCord) to Clyde M. Walker and wife by their executing a $7,-000 installment note to Dallas Federal Saving and Loan Association, payable $80 per month, at interest as therein provided, the Walkers advancing $3,000 in cash, which preliminary transaction was consummated by Deed of April 7, 1955.

The later deed from the Walkers to plaintiff Cooper was dated August 29, 1955 and recited "$10.00 cash and other good and valuable considerations"; the assumption of balance due ($6,884.33) of the Dallas Federal Saving and Loan Association's first lien note; also "the execution and delivery by the grantee herein of one cer-

tain promissory note of even date herewith in the principal sum of Three Thousand and No/100 ($3,000.00) Dollars bearing interest from date until maturity at the rate of 6% per annum, being due and payable as therein provided; said note is secured by Subordinate and Inferior vendor's lien herein retained and additionally secured by Deed of Trust of even date herewith to W. R. Knight, Trustee." Said deed was acknowledged by grantors on September 21, 1955. The mentioned $3,000 second lien note and Deed of Trust executed by plaintiff in the transaction bore same date as the deed; the deed of trust instrument also being acknowledged by Mrs. Cooper on September 21. Said $3,000 note provided for payment at $20 per month beginning September 29, 1956 at 6% interest; providing further, viz.: "It is agreed and understood that the maker hereof will pay $500.00 on or before January 17, 1956 and an additional $500.00 to be paid on or before July 17, 1956." The note had been assigned by the Walkers to Helen M. Steen and the first $500 installment was paid to her by Mrs. Cooper on February 6, 1956. Here it will be observed that the contract of sale recited that maturity of the two $500 payments was to be six and twelve months "from date of closing"; defendant contending that the closing date was August 29, 1955, date of the Walker-Cooper deed; plaintiff contending that the closing date was October 10, date of filing deed for record; Mrs. Cooper testifying that she called attention of Mrs. Steen to the discrepancy, the latter admitting the second lien note to be erroneously drawn but that she would not seek foreclosure until "your due time * * * I will let you use your contract"; and that with this reservation such note and deed of trust were signed.

According to Mrs. Cooper, defendant Steen attempted to foreclose on the property in July 1956, claiming default in payment of the second $500 installment due July 17, 1956, posting notices; likewise in July and September, to which injunction suits were interposed; actual foreclosure being consummated November 6, 1956; the record

showing a trustee's deed of that date, consideration $2,500 paid by Helen M. Steen; under which the latter had repossessed the property.

As already stated, appellees' motion for instructed verdict was based on the claim of no evidence or insufficient evidence to raise any issues of fact for the jury. This would ordinarily require an analysis of plaintiff's pleadings, also the evidence material thereto. We have so examined the record but will simply make reference to the trial court's summation of the case in such connection made to the jury as explanatory of reasons for grant of motion resulting in the defendants' judgment.[1]

1. The informal statements of Judge Claude Williams to the jury at the close of testimony on behalf of plaintiff were virtual findings of fact; being here quoted:

"The Court: You gentlemen, of course, know that under our system of jury trials, that the law is well settled, and rightfully so, that where one or the other party have a piece of litigation, and demand a jury, that that party shall have the right to have the disputed issues of fact submitted to a jury for consideration. It is a very valuable right, and one that we are very proud of, and I certainly am.

"Now, the courts have repeatedly held, and I think rightfully so, that at the conclusion of the plaintiff's testimony, in other words, after the plaintiff has been given every opportunity to prove his case as pleaded, that then if the trial judge finds that there is no issue to go to the jury, of course, it becomes his duty then to pass upon the case himself and dispose of it.

"And, acting upon a motion, such as that dictated by Mr. Piranio, our Supreme Court, and other courts, have repeatedly held that the trial judge must view the testimony most liberally in favor of the plaintiff.

"In other words, I must, Mr. Piranio and Mr. White, as you know, look upon Mrs. Cooper's testimony in the most favorable light, and concede the truth of every bit of it.

"It is somewhat like our old general demurrer practice in the old days, which said that even if conceding everything they said is true, they still don't have a lawsuit.

"So, in acting upon Mr. Piranio's motion, I am giving full credit to everything that Mrs. Cooper testified, and her witnesses have said.

"Basically, gentlemen, the plaintiff in this case has filed a suit in the nature of such as to seek equitable relief, claiming that she has the right to cancel and rescind a certain deed, and deed of trust and notes evidenced thereby.

"That is an equitable cause of action, and the courts have repeatedly held, as we all know, that in order to seek equity, one must do equity, and also that one seeking equity must come into court with clean hands and demonstrate that.

"Now, in addition the cause of action based upon the equitable relief, sought in the nature of cancellation and rescission, the plaintiff has asked for a judgment for damages to personal health and so forth, seeking money damages.

"Going back to the first cause of action, for cancellation and rescission, I am bound by the pleadings of the plaintiff and the testimony of the plaintiff.

"The pleadings of the plaintiff in substance say two things; that the defendants here defrauded me in two ways.

"One, they told me the property was worth $11,000.00, where it was not worth but $7,000.00.

"Now in a case of fraud, of course, the elements are necessarily, one, whether or not a statement was made;

"Two, was the statement false.

"And going back to Number 1, that must be a statement of a material fact, not an immaterial fact, but a material fact.

"Number 1, is it a statement of material fact?

"Number 2, was that fact false?

"Number 3, did the defendant rely upon that statement to her damage?

"Now, those elements are necessary in order to establish a cause of action for fraud.

"The first say you told her it was worth $11,000.00, when that was not true, it was only worth $7,000.00.

"Well, the proof shows by the plaintiff's own witness that it was worth more than $11,000.00, Mrs. ——

"Mr. Piranio: Rector.

"The Court:—Rector testified it was worth more than $11,000.00, and Mrs. Cooper has never testified that she thought it was worth—I don't remember any testimony on her part that she was misled by any statement that these defendants made to her in regard to value.

Attention is directed to the trial court's oral finding that "the claim of the plaintiff concerning harassment or intimidation, or keeping her from selling the property, has not been supported by proof, in order for her to meet the burden of proof"; plaintiff having pled in original petition that "that defendants have constantly intimidated, harrassed, and obstructed plaintiff's efforts to sell her property and said sales have been lost, prevented and interferred with by said defendant Helen M. Steen talking with prospective buyers and discouraging them from buying; that said intimidation, harrassment, and such fraud perpetrated upon Plaintiff has impaired her health and damaged her entire nervous system for the rest of her life; to plaintiff's further damage in the sum of $50,000.00."

We turn to the evidence offered by plaintiff in this connection. Mrs. Cooper had

"Furthermore, the testimony shows that she had every opportunity to confer with outside people. And there is a recent holding that where the party has an opportunity to investigate on her own volition and check upon values, that the duty becomes hers to do so.

"They say Mrs. Cooper testified here that she did have other people that she could have gone to see, and as a matter of fact, I think she did.

"Now, the second charge is made here that you told her that it was short 3600 square feet.

"I find no testimony here that these defendants made any representation to her at all about the property, the description of the lot is in lot numbers.

"I find that there is no testimony here to support that charge of fraud.

"Now, she next says they were supposed to give her a title policy.

"I find there is no proof sufficient to support that charge, and, furthermore, I do not find that there could be any material difference whether they gave her a title policy, or not, I do not see how that could affect this lawsuit.

"They next say they withheld rentals. I do not find that. And, on the contrary, I find that between the months of April and October, that they did credit rentals to the first lien note as agreed upon.

"There is no evidence here that this property was worth the reasonable rental of $400.00 as alleged here in Paragraph Four.

testified to an inability to meet the $500 installment payment second lien note due prima facie on July 17, 1956 and had determined to sell the property in an effort to save her equity; placing an ad in a local newspaper describing it, along with the sale price ($11,000) and her telephone number. She claimed that a Mrs. E. W. Rector was a prospective purchaser, who upon a 'phone call, was answered by defendant, Mrs. Steen, the latter discouraging any transaction with Mrs. Cooper stating that she was "crazy".

■ "Any intentional invasion of, or interference with, property, property rights, personal rights, or personal liberties causing injury without just cause or excuse is an actionable tort". 86 C.J.S. Torts § 40, p. 954; 25 Tex.Jur. (Interference) page 33. Bearing in mind this general principle, the following excerpts are quoted from the tes-

. "There is no evidence of any rents withheld, willfully, or wrongfully, or at least I do not find sufficient evidence.

"Now, the paragraph concerning her health, pertaining to Paragraph Five of the petition, the only testimony that I hear is from Mrs. Cooper, in answer to question, she said she has not felt good since a certain date. There is no evidence here of any proximate cause, as to what caused that illness.

"She testified she was under the care of Dr. Hurt and Dr. Sukahara, but neither one of those doctors ever appeared to give any professional opinion as to what caused her illness.

"She may have been ill before, or she may have had the flu, or Asiatic flu, I don't know, but anyway, there is just not sufficient evidence here to show a casual relationship, or a connection between any acts done by these defendants, and her claim that she does not feel good since a certain date.

"The claim of the plaintiff concerning harassment or intimidation, or keeping her from selling the property, has not been supported by proof, in order for her to meet the burden of proof.

"I find, gentlemen, that taking a most favorable look at Mrs. Cooper's testimony that no issue of fact is presented to this jury, and I will withdraw the case from the jury and render judgment for the defendant."

timony of Mrs. Rector, a witness for plaintiff: (on direct-examination):

"Q. Now, do you know Dorothy E. Cooper, Mrs. Rector? A. Yes, indeed I do.

"Q. How long have you known her, Mrs. Rector? A. I have been knowing her about 20 years, Mr. White.

"Q. During that time have you known of her to be—have any employment? A. She is a very good practical nurse, very good.

"Q. Does she make a little income out of that? A. Yes, some income. * * *

"Q. (By Mr. White) Are you acquainted with this property on Ira Street? A. Yes, I am.

"Q. Have you been out there, Mrs. Rector? A. No, I haven't been out there, but I am acquainted with it through the ad that was in the paper.

"Q. What type of ad was that? * * * Was it an employment ad or sale ad or what? A. It was a sale ad trying to sell her place, I believe.

"Q. On this property? A. Yes, sir.

"Q. Did you answer that ad? A. I sure did.

"Q. Did you call a telephone number? A. Yes, I did.

"Q. Was there any name displayed in the ad? A. Yes, I asked her who she was, and she told me that her name was Mrs. Steen and said that—:

"* * * The Court: Do you recall what month and what year? A. It was in July, around the 10th of July.

"Q. (By Mr. White) In '56? A. In '56, yes.

"Q. A person answered the phone? A. Yes.

"Q. Now, who did the person say she was? A. Mrs. Steen, Stein, whatever you call it.

"Q. Did you have any conversation with her? A. Yes, I talked to her. * * * I asked her if the place was for sale, and she said 'Yes.' She said that, however, Mrs. Cooper didn't have anything to do with it. I asked her who did it belong to, and she told me that she had, she had charge of it now, Mrs. Cooper didn't have it no more.

"Q. She had taken it from her? A. That she had taken it from her, taken it over, she said. She said Mrs. Cooper didn't have it no more. * * *

"Q. Did you ever buy this property? A. Sir?

"Q. Did you sign a contract on this property? A. No, sir, I surely didn't, she told me—* * *

"Q. (By Mr. White) Did you have a conversation with Mrs. Cooper about this property? A. I sure did.

"Q. Did anything result from it? A. No.

"Q. Did you have any other conversation with Mrs. Steen? A. Yes, I called her a day or two after that and talked to her. * * *

"Q. What was that conversation with Mrs. Steen? A. I still asked her about the property, who I could talk to about it, and she said talk to her, she had charge of it now, Mrs. Cooper was crazy. That is the very words she said.

"Q. And you have known Mrs. Cooper for twenty years? A. I sure have.

"Q. Has she ever displayed any incompetency to you? A. No. * * *

"Q. Did you ever talk to Mr. and Mrs. Walker? A. Yes.

"Q. A Mr. or Mrs. Walker? A. Yes, I talked to Mr. Walker at one time.

"Q. Is the gentleman here? A. I never saw him, just over the telephone.

"Q. When was that, Mrs. Rector. A. That was about the same time that I talked to her.

"Q. Was that with reference to this ad? * * * Was that with reference to this property? A. Yes, it was.

"Q. Did you make any offer to buy it? A. Well, he wanted me to buy it, he asked me, 'Why don't you buy it?'

"The Court: The question was, did you offer to buy the property? A. No, Judge, I didn't.

"The Court: All right, that is an answer to the question. Now, pay attention to his questions and answer them.

"Q. (By Mr. White) Was that after you had talked to Mrs. Steen? A. Yes, sir. * * *

"Q. State the conversation that you had with this defendant and all of it, with Mr. Walker, the conversation that you had with him on that day. Please state for this record the full extent of that conversation. A. Well, I called him and asked him—* * * if he knew anything about the property, and he said he did. He says, 'Mrs. Rector', he says, 'Why don't you buy it?' And I says, 'Well, if the woman is crazy I sure don't want to buy it from her, nobody wants to buy property from someone that is crazy.'"

On cross-examination of Mrs. Rector we quote (all italics ours.)

"Q. Now, this ad was put in the paper by whom, do you know who it was put in the paper by? A. Well, it was put in the paper by Mrs. Cooper, I suppose.

"Q. By Mrs. Cooper, and the number, the telephone number you called, then, was Mrs. Steen's number? A. It was Mrs. Cooper's name, but she happened to be up at the house the day that I called there.

"Q. Now, just a moment, Mrs. Rector, answer my question. You don't know, you weren't there to see that she was up at the house, were you? A. Well, there were some people in—

"Q. Answer my question. A. No, I wasn't there.

"Thank you, ma'am. And you have never talked to Mrs. Steen prior to this telephone conversation you spoke of, have you? A. I have spoken to her on two occasions.

"Q. Prior to the telephone call? A. No.

"Q. Then, you didn't know whether the person you were talking to over the telephone was Mrs. Steen, or not? A. Well, she said she was the owner of the property.

"Q. Well, the only thing you have got to go on is the person on the other end of the line said 'I am Mrs. Steen, and the owner of the property'? A. Well, she shouldn't say she was Mrs. Steen if she wasn't.

"Q. Mrs. Rector, will you please answer that, now, I don't know whether she should, or not, but you to your own knowledge, you do not know at this point that the person on the other end of the line was actually Mrs. Steen, do you? A. Well, from her conversation—

"Q. Do you know that of your own knowledge? A. Only from a conversation yesterday evening up here, I heard her voice over the telephone and up here yesterday evening, and it sounded exactly alike.

"Q. Just a moment. Then you are not telling us here you knew at that time that you talked to Mrs. Steen over the telephone, did you, or did you? A. I didn't know it was her, no.

"Q. All right. A. But, she said she was.

"Q. You never made an offer to buy that property? * * * A. *I certainly did.*

"Q. To whom did you make it? A. To her, I told her I wanted a place to buy, yes.

"Q. What did you offer her for it? A. *We didn't come to that agreement, because she said Dorothy Cooper was crazy.*

"Q. Just a moment, I didn't ask you that, Please, ma'am. A. Yes.

"Q. Will you answer my question? A. I answered it.

"Q. You said you offered to buy it to the person on the telephone, is that right? A. I started to, but I didn't come out and tell her what I offered for it, but I asked her if it was for sale, and she said 'Yes', and she was the owner.

"Q. That was the person on the other end of the line? A. Yes.

"Q. You never got down to actually making an offer to buy the property? A. She didn't give me time.

"Q. Did you ever offer to buy the property from Mrs. Cooper? A. Well, we have talked about it several times.

"Q. Well did you ever get together on anything? A. No.

"Q. Then, you were not ready to buy the property any time? A. *Oh, I am ready at any time to buy it.*

"Q. All right, now, *would you give $11,000.00 for it?* A. What is that?

"Q. Would you give $11,000.00 for it now? A. Would I give $11,000.00?

"Q. Yes. A. *No, I had another place in view when she told me she was crazy and wanted to sell.*

"Q. Would you give $11,000.00 for it then? A. *Certainly.*

"Q. *It was worth it?* A. *It was worth a whole lot more.*

"Q. It was worth a whole lot more then, in your mind, it was a pretty good buy out there, wasn't it, Mrs. Rector? A. It was for some people.

"Q. So, if you could have gotten the $11,000.00, you would have bought it from Mrs. Cooper, wouldn't you? A. Oh, I don't know that I would.

"Q. You said you thought it was worth that much. A. It was worth a whole lot more, I said.

"Q. You don't know who put this ad in the paper, do you? A. Mrs. Cooper put the ad in the paper, of course.

"Q. You talked with Mrs. Cooper about it? A. I have been talking with Mrs. Cooper for twenty years.

"Q. All right, you are a pretty good friend of hers, aren't you? A. You bet you.

"Q. How did you get Mr. Walker's number? A. I got it through Mrs. Cooper.

"Q. Did she tell you to call him? A. No, she just—I did it on my own account.

"Q. So, you had no reason at all to call Mr. Walker? A. Oh, yes, I had my reasons to call him, I wouldn't have called him unless I had a reason to.

"Q. But, if you have known Mrs. Cooper for twenty years you would be more than happy to buy her property, if you could get together, wouldn't you? A. I don't think I have to answer that question.

"Mr. White: Well, now, I think any proper question, of course, Mrs. Rector, you need to answer it. A. All right.

"Mr. White: I believe the court will instruct you to that. A. *I would have bought it, yes.*

"Q. (By Mr. Paranio) Irregardless of anything that Steen or Walker might have said, right? A. Oh, no, no, I used my own judgment in those kinds of deals, you know it.

"Q. All right, you used your own judgment, you didn't rely on Steen or Walker at all? A. *She told me that woman was crazy, I sure didn't want to buy it.*

"Q. Just a moment, you didn't rely on Steen or Walker? A. I relied on myself, Angelo Piranio.

"Q. Thank you, Mrs. Rector. And therefore— A. I have got sense enough to know what I am doing.

"Q. I realize that, Mrs. Rector. A. You bet I do.

"Q. Yes, you understand that, and that is what I want you to tell this jury that, regardless of the Walkers or the Steens, if you would have bought it, you would have

relied on your own judgment, wouldn't you? A. Sure, *I don't want anybody that is crazy selling property to me.*

"Q. That is why you would not have dealt with Walker or Steen, you didn't believe them, did you? A. She isn't crazy by no means.

"Q. I see. You wouldn't believe Walker or Steen, you didn't believe them, you didn't rely upon their statements, did you? A. Why, no."

It would appear, that reflected in the foregoing testimony, are the elements of a wrongful interference by Mrs. Steen concerning the sale by plaintiff of her own property. At the time, July 1956 Mrs. Cooper was in lawful possession, with said defendant Steen occupying more or less the status of a trespasser. Certain statements of Mrs. Rector may be seen as inconsistent or conflicting; yet this witness testified in effect that she would have then given $11,-000 for the property but was dissuaded by the derogatory attitude and representations of Mrs. Steen. And while the allegations of plaintiff relative to intimidation and interference were inadequately pled, defendants' exceptions in such respect were not ruled upon.

 Obviously a financial loss has resulted to plaintiff in a failure to dispose of her property at $11,000; and appellees may argue damage without injury has resulted to Mrs. Cooper in that there was no contract with the prospective buyer (Mrs. Rector) to be interfered with. "It must appear, in order that the conduct may be tortious, that damage has been occasioned thereby; but it need not be absolutely certain that the prospective contract would have been made were it not for such interference; A reasonable assurance thereof, in view of all the circumstances, is sufficient". 86 C.J.S. Torts § 43, p. 959; Owens v. Williams, 322

Mass. 356, 77 N.E.2d 318, annotated in 9 A.L.R.2d p. 228 "Interference with business relations".[2]

A fuller discussion of the law question thus posed will not now be undertaken. Appellant has not expanded upon her point six (jury determination of the issue on interference and intimidation); leaving appellees slight opportunity for reply. Doubtless a full development of the point, pro and con, will be forthcoming upon rehearing. At this juncture, however, we conclude that under the instant record a prima facie case is made of tortious interference by Mrs. Steen in appellant's lawful right to dispose of her own property; sufficient at least to raise issues for determination by the jury. If necessary to this opinion, we further conclude that the trial court's finding of fact on other phases of the litigation are sustained by the record.

Reversed and remanded for another trial.

---

2. The Texas case of Payne v. Gebhard, Tex.Civ.App., 136 S.W. 1118 is not viewed as in conflict with the principle just quoted. There the controversy was between rival brokers, negotiations of the complaining broker not having ripened into a contract; and involved the elements of lawful competition and "justifiable interference in another's business relations." 30 Am.Jur. p. 88.