**FROST NATIONAL BANK, Trustee, Appellant,**

v.

**ALAMO NATIONAL BANK, Appellee.**

**No. 14620.**

Court of Civil Appeals of Texas.

San Antonio.

Oct. 25, 1967.

Earle Cobb, Jr., San Antonio, for appellant.

Matthews, Nowlin, Macfarlane & Barrett, Houston & Thompson, Craig L. Austin, San Antonio, for appellee.

BARROW, Chief Justice.

Appellant brought this suit as Trustee of the Estate of Jack Ammann, Deceased, to recover damages from appellee for inducing Geotechnics and Resources, Inc., to breach a contract with the Ammann Estate not to mortgage a Map File as long as certain promissory notes executed by Geotechnics to the Ammann Estate were outstanding. The trial court entered a take-nothing judgment after a jury trial.[1]

Appellant, hereinafter sometimes referred to as Frost, complains of the trial court's errors in overruling its objections to the special issues submitted to the jury and in improperly defining words accompanying these issues. It also urges that the trial court erred in not granting appellant's motion for instructed verdict, but if issues were to be submitted, the court should have given those requested by appellant. By counter-points, appellee urges that its motion for instructed verdict should have been granted under the legal concepts of res judicata by action of the Bankruptcy Court, exclusiveness of remedy, and that appellant's rights under the restrictive covenant were terminated upon renewal of the original notes.

---

1. The jury returned a verdict substantially as follows:

1. On or before January 31, 1963, Alamo, by and through its duly authorized agents or officers DID NOT have actual knowledge of the negative covenant.

2. On or about May 9, 1963, Frost represented that it would not "accelerate the note of Geotechnics at the present time," prior to Alamo having made additional loans and extending credits to Geotechnics.

3. Alamo relied upon such representation in making additional loans and extending additional credits to Geotechnics after having received the May 10, 1963, chattel mortgage from Geotechnics covering the Map File.

4. On or about January 31, 1963, Alamo, by and through its duly authorized agents or officers, DID NOT induce, or contribute to induce a breach of the negative covenant in the contract between Geotechnics and the Ammann Estate.

5. Damage issue conditionally submitted on No. 4, and unanswered.

On November 8, 1961, an agreement was executed between Mrs. Dorothy Lee Ammann, Independent Executrix of the Jack Ammann Estate, and Geotechnics whereby Mrs. Ammann agreed to sell Geotechnics 101,068 shares of the common stock of Jack Ammann, Inc. As part of the consideration therefor, Geotechnics executed a note in the amount of $50,000, payable without interest on or before 13 months after the closing date, and another note in the principal sum of $300,000, with interest at 6% payable in monthly installments of $2,531.57, secured by a deed of trust lien on the property known as 931 Broadway, San Antonio, which was the principal place of business of Jack Ammann, Inc. It was further agreed that while any balance remained due on either of these notes neither Geotechnics nor Jack Ammann, Inc., should encumber the stock of negatives owned by Jack Ammann, Inc., commonly referred to as the Map File. Any violation of this negative covenant without the written consent of the holder of these notes gave the holder the option to accelerate the balance due on same.

On the same date, a plan to merge Geotechnics & Resources, Inc., a New York corporation, and Jack Ammann, Inc., a Texas corporation, was submitted and subsequently adopted by the stockholders of both corporations, with the surviving corporation known as Geotechnics & Resources, Inc. Prior to this merger, both companies were engaged in the business of making aerial photographs and preparing maps, etc., from these photographs. The Map File consisted of negatives from which photographs were printed upon order from customers, primarily oil companies and governmental agencies.

On February 1, 1963, the two promissory notes were renewed and surrendered, by agreement of Geotechnics and the Ammann Estate, and a single new note in the principal sum of $335,711.40 was executed. This note, payable in monthly installments of $2,531.57, was secured by a deed of trust on the Broadway real estate. On March 15, 1963, the assets of the Ammann Estate, including this renewal note, were transferred to the Frost National Bank as Trustee under the will of Jack Ammann.

By January, 1963, Geotechnics was in financial difficulty and had secured a line of credit with appellee, hereinafter referred to as Alamo. In the beginning, sufficient credit was obtained on the security of its accounts receivable. Its financial condition gradually worsened and these accounts were not sufficient to cover all money needed. On January 31, 1963, a chattel mortgage on the Map File was given by Geotechnics to Alamo as security for a loan of $100,000.

The financial condition of Geotechnics continued to deteriorate and in April, 1963, it was forced to arrange for Mr. Rollins King to guarantee a $100,000 loan made by Alamo. Mr. Neill Boldrick, attorney for Mr. King, learned of the restrictive covenant regarding the Map File in a conversation with Mr. Horner, a Frost trust officer who was handling the Ammann Estate. Mr. Boldrick immediately advised Mr. Parker, the Alamo officer in charge of Geotechnics' account, who advised Geotechnics officers that they must contact Frost to secure a waiver of this acceleration right if Alamo was to continue to finance Geotechnics.

On May 9, 1963, the Trust Committee of Frost met and, after discussion of Geotechnics' chattel mortgage of the Map File to Alamo contrary to the restrictive covenant, decided not to accelerate the note "at the present time." The representatives of Geotechnics communicated this information to Mr. Parker. On May 10, 1963, Alamo took a second chattel mortgage on the Map File to secure past and future indebtedness of Geotechnics to Alamo. The amount owed by Geotechnics to Alamo at that time is not clearly shown in the record, although it was obviously substantial. This mortgage was recorded on May 17, 1963. Alamo continued to make loans to Geotechnics until Geotechnics was forced into bankruptcy in October, 1963. In the meantime, Geotech-

nics kept up the monthly payments owed the Ammann Estate on the renewal note.

In the bankruptcy proceedings, Alamo asserted a claim in the amount of $429,167.75, secured in part by the two chattel mortgages on the Map File. This claim was contested by the employees of Geotechnics and also the Internal Revenue Service asserted its tax lien was superior. Frost did not oppose the claim of Alamo to this security. The Bankruptcy Court allowed Alamo's secured claim, and the proceeds from the sale of the Map File in the amount of $155,100 were paid to Alamo by order dated September 11, 1964.

Frost submitted a claim as a secured creditor, in which it asserted total indebtedness of $333,056.38, plus attorney's fee of 10%, secured only by the deed of trust on the Broadway property. After sale of the real estate, the balance of Frost's claim, which was stipulated to be $141,650, was allowed as an unsecured claim. The percentage of distribution to unsecured creditors was 11.72%. On May 27, 1966, an order was entered closing the bankruptcy case of Geotechnics. This suit was filed on January 29, 1965, seeking a first lien on the Map File or damages of $156,000.

The trial court did not err in overruling appellant's motion for an instructed verdict and rendering a take-nothing judgment upon the jury verdict. Appellant urges that the undisputed evidence establishes that Alamo induced Geotechnics to mortgage the Map File and if it had not done so Frost would have recovered as a general creditor its pro rata part of the sum realized from the sale of the Map File.

The jury found in response to Question No. 1, that Alamo did not have actual knowledge of the negative covenant prior to January 31, 1963. Appellant timely objected and now urges three objections to the submission of this issue: (1) the issue required a finding of "actual knowledge," whereas only "actual notice" was required; (2) the chattel mortgage was void because

Alamo failed to comply with the Bulk Sales Act, Art. 4000, Vernon's Ann.Civ.St., Rep.Acts 1965, 59th Leg., Ch. 721, Eff. June 30, 1966; (3) the evidence establishes as a matter of law that Alamo had notice of the negative covenant.

**■** (1) Inasmuch as the crux of a tort action for wrongfully inducing another party to breach his contract is knowledge of the contract, the trial court correctly required a finding of "actual knowledge" by Alamo and refused Frost's requested definitions of "actual notice." In Lytle v. Galveston, H. & S. A. R. Co., 100 Tex. 292, 99 S.W. 396 (1907), the Supreme Court recognized that one who willfully and without legal justification or excuse interferes so as to bring about a breach of a contract between others is guilty of an actionable wrong. The Courts have uniformly recognized that the conduct necessary to support a cause of action for interference must be willful and intentional. Raymond v. Yarrington, 96 Tex. 443, 72 S.W. 580, 73 S.W. 800 (1903); Davis v. Freeman, 347 S.W.2d 650 (Tex.Civ.App.—Dallas 1961, no writ); Cooper v. Steen, 318 S.W.2d 750 (Tex.Civ. App.—Dallas 1958, no writ); Yarber v. Iglehart, 264 S.W.2d 474 (Tex.Civ.App.—Dallas 1954, no writ); 33 Tex.Jur.2d, Interference, § 4; 86 C.J.S. Torts § 44; 26 A.L.R.2d 1127.

**■** (2) The Map File consisted of a group of photographic negatives. If a customer desired a map of a particular area, this negative was used to reproduce a photograph of the area. This photograph was sold to the customer and the negative remained in the file. Photographic negatives are not a "stock of goods, wares or merchandise daily exposed to sale" as described in Art. 4000, supra, and the Bulk Sales Law has no application to the mortgage of this Map File. It follows that the trial court did not err in refusing to admit evidence of the Texas or New York Bulk Sales Laws, or in refusing to submit issues of negligence based on Alamo's failure to comply with same.

■ (3) Mr. Parker testified that he had no knowledge of the negative covenant until Mr. Boldrick advised him in April or May, 1963, of its existence. This testimony is corroborated by his prompt action in contacting Geotechnics and requiring its officers to check with the Frost Bank trust officers as to whether or not the Bank would accelerate the note. A copy of the merger agreement was found in Geotechnics' file at Alamo, although there is no evidence establishing how or when it got into this file. Furthermore, Mr. Parker, as a personal stockholder in Ammann, Inc., probably received a copy of the merger agreement, as one was sent to each stockholder along with a letter from the president of Ammann, Inc. Mr. Parker did not deny receiving these instruments, but said if he did, he paid no attention to the details set forth in the merger agreement other than the outline contained in the president's letter which recommended the merger. We cannot say that this evidence establishes as a matter of law that Alamo had actual knowledge of the negative covenant prior to the execution of the chattel mortgage on the Map File on January 31, 1963.

■ The trial court did not err in submitting Question No. 1, and there is sufficient evidence to support the jury's finding that Alamo did not have actual knowledge of the negative covenant when it took the chattel mortgage on the Map File. Question No. 4 inquired if Alamo on or about January 31, 1963, induced a breach of the negative covenant in the sales contract between Geotechnics and the Ammann Estate. Although this issue was not conditioned upon an affirmative finding to Question No. 1, obviously Alamo could not have induced Geotechnics to breach the negative covenant if it was not aware of same. Any error in the definition of inducement given in connection with Question No. 4 would therefore be harmless.

On May 10, 1963, Alamo took a second chattel mortgage from Geotechnics on the

Map File, and the evidence is undisputed that prior to this time it had actual knowledge of the negative covenant. Alamo urges, however, that Frost is estopped from asserting any complaint to Alamo's action in taking this second chattel mortgage because of the jury's findings on Questions Nos. 2 and 3.

■ Question No. 2 inquired as to whether Frost represented, on or about May 9, 1963, that it would not accelerate the note of Geotechnics at the present time prior to Alamo having made additional loans and extending additional credits to Geotechnics. Although this issue appears to be undisputed, we cannot say that reversible error is shown by the giving of same. Rule 434, Texas Rules of Civil Procedure. Question No. 3, which was predicated upon an affirmative answer to No. 2, inquired as to whether Alamo relied upon such representation in making additional loans and extending additional credits to Geotechnics after having received the chattel mortgage on the Map File executed May 10, 1963. The minutes of the May 9, 1963, meeting of Frost Bank Trust Committee state that after discussing the fact that Geotechnics had recently mortgaged the Map File to Alamo to secure further advances of cash to the company in violation of the negative covenant, the Committee decided "not to accelerate the note of Geotechnics at the present time because of this breach of the covenant in the sales contract."

Mr. Parker testified that after Mr. Boldrick had advised him of the negative covenant, he immediately contacted Geotechnics' officials in New York, and shortly thereafter they came to San Antonio. Mr. Parker told them Geotechnics would have to contact Frost, because if Frost accelerated the note and foreclosed the real estate, Geotechnics would be out of business as a practical matter. On the morning of the Frost Trust Committee meeting, Mr. Horner discussed the Alamo loans with Mr. Parker for the purpose of reporting to the Committee. The action of the Trust

Committee was communicated to Alamo by Geotechnics.

It was to the definite advantage of the Ammann Estate that Geotechnics stay in business, and it is undisputed that five monthly payments were made on the note prior to the company's being placed in involuntary bankruptcy. The second chattel mortgage was placed of record on May 17, 1963. The record shows that Alamo continued to advance funds to Geotechnics until the bankruptcy action. At no time prior to filing this suit did Frost ever question Alamo's action in acquiring the chattel mortgages on the Map File or the validity of same. In the bankruptcy proceeding, Frost sought security only from its real estate lien.

The evidence is sufficient to raise a fact issue that Alamo relied on the action of the Frost Trust Committee in not accelerating the note on May 9, 1963, for Geotechnics' breach of the negative covenant. Frost urges that its resolution that it would not accelerate the note "at the present time" was not a misrepresentation and therefore there can be no estoppel. The record is conclusive that Alamo had Geotechnics contact Frost for the specific purpose of ascertaining if Frost would exercise its right of accelerating the note. Frost knew of the precarious financial condition of Geotechnics and that an acceleration of its $300,000 note would undoubtedly cause Geotechnics to collapse. It further knew that Alamo was financing Geotechnics and would continue to do so if the note was not accelerated. Frost could reasonably anticipate that additional security would be required for this extensive credit.

■ Although Frost's action in not accelerating the note "at the present time" obviously left open the right to accelerate the note at some future time, it did not do so. Under all the circumstances, we cannot say as a matter of law that this failure to accelerate on May 9, 1963, did not mislead Alamo into taking the second mortgage on the Map File and continuing to advance credit to Geotechnics.

■ In Petroleum Anchor Equipment, Inc. v. Tyra, Sup., 419 S.W.2d 829, 833 (1967), the Supreme Court restated the applicable rule as follows: "While a party may be estopped to assert his legal rights against another when his conduct misleads such other to his detriment, and the misleading conduct may consist of a failure to act when there is a duty to act, Johnson v. Sovereign Camp W.O.W., 125 Tex. 329, 83 S.W.2d 605 (1935); Burnett v. Atteberry, 105 Tex. 119, 145 S.W. 582 (1912), the party asserting an estoppel must establish that he relied on the misleading conduct to his detriment. Concord Oil Co. v. Alco Oil and Gas Corp., 387 S.W.2d 635 (Tex. Sup.1965); Gulbenkian v. Penn, 151 Tex. 412, 252 S.W.2d 929 (1952)."

■ In our case there is a jury finding that Alamo relied upon Frost's conduct and made additional loans and extended additional credits to Geotechnics. Therefore, Frost is now estopped from complaining of Alamo's action in securing the second chattel mortgage from Geotechnics.

The trial court properly entered a take-nothing judgment under these findings of the jury. The judgment of the trial court is affirmed.