NUMBER 13-09-00657-CV

 

COURT OF APPEALS

 

THIRTEENTH DISTRICT
OF TEXAS

 

CORPUS CHRISTI – EDINBURG

                                                                                                                             

 

HINO ELECTRIC HOLDING COMPANY, L.P.

D/B/A HINO ELECTRIC POWER COMPANY,                                    Appellant,

 

v.

 

CONSTELLATION NEWENERGY, INC., ET AL.,                     Appellees.


                                                                                                                             

 

On appeal from the 357th
District Court

of Cameron County, Texas.

                                                                                                                             

 

MEMORANDUM OPINION

 

Before Justices
Garza, Vela, and Perkes

Memorandum Opinion by
Justice Garza

 

            In this lawsuit,
appellant, Hino Electric Holding Company, L.P. d/b/a Hino Electric Power
Company (“Hino”), filed claims against appellees, Constellation NewEnergy
(“Constellation”) and CP&L Retail Energy L.P. (“CP&L”), for tortious
interference with existing and prospective contracts.  At the conclusion of
Hino’s case-in-chief, Constellation and CP&L moved for a directed verdict,
which the trial court granted.  On appeal, Hino argues that the record contains
sufficient probative evidence to raise fact issues as to the essential elements
of its tortious interference claims; thus, the trial court erred in directing
verdict in favor of Constellation and CP&L.  We affirm.

I.             
Background

On December 28, 2005, Hino and the
City of Harlingen (the “City”) entered into a “Master Power Sales Agreement,”
whereby Hino agreed to provide electricity to the City from January 1, 2006 to
December 31, 2006.  In April 2006, Hino proposed that the City agree to a
“Blend and Extend” option, which would allow the City to lock in energy prices
at a lower rate for 2007, because Hino forecasted that energy prices would
increase during 2007. 

            On April 26, 2006, the
City agreed to the “Blend and Extend” option, which was purportedly effective
from December 31, 2006 to September 30, 2007.[1] 
However, included in the “Blend and Extend” contract was a “continuing right”
for the City to terminate the contract “at the expiration of each budget period
during the term of the ‘Blend and Extend’ contract.”  On April 28, 2006, prior
to the parties signing the “Blend and Extend” contract, Hino procured 32,755
megawatts of electricity from Coral Power, L.L.C. for delivery to the City from
January 1, 2007 to September 30, 2007, for the term of the “Blend and Extend”
contract.

            Falling energy prices in
September 2006 prompted the City to look for a lower electricity price. 
Thereafter, at a meeting conducted on September 27, 2006, the City Attorney
requested that Hino present alternative pricing to the City or else the City
would opt to terminate the “Blend and Extend” contract in accordance with its
terms.  In addition, the City requested that R.J. Covington, a consultant for
the South Texas Aggregation Project (“STAP”), ask several retail energy
providers, including Constellation, to provide indicative price quotes covering
October through December 2006.

At the September 27, 2006 meeting,
Hino agreed to submit alternative pricing to and renegotiate with the City;
however, at a subsequent meeting held the next day, Hino appeared with counsel,
declined to provide alternative pricing, and insisted that the City had no
authority to opt out of the “Blend and Extend” contract.  At the conclusion of
the September 28, 2006 meeting, the City voted to opt out of the “Blend and
Extend” contract and to revert to the terms of the one-year “Master Power Sales
Agreement.”  In compliance with the “Master Power Sales Agreement,” the City
continued to pay Hino for all electricity delivered to the City through the end
of 2006.

            In October 2006, the City
Attorney sent official requests for pricing (“RFPs”) to various energy
suppliers.[2] 
Among the suppliers that responded was Constellation, which provided a price
quote and an offer to supply energy to the City at a specified price.  On October
26, 2006, Gloria Cordoba, an account executive for CP&L, cold-called the
City to inquire about its energy needs.  Cordoba was directed to the City
Attorney’s office, who informed her that the City was looking for a supplier
for 2007.  The City Attorney authorized Cordoba to access the City’s usage
information, and Cordoba, on behalf of CP&L, provided the City with a price
quote and an offer to supply energy to the City.  Faced with competing offers
from Constellation and CP&L, the City chose to enter into an agreement with
CP&L to provide the City with electricity in 2007, once the “Master Power
Sales Agreement” with Hino expired.

            After learning that the
City entered into a contract with CP&L to provide electricity for calendar
year 2007, Hino sued the City for breach of contract, requesting that the City
specifically perform under the “Blend and Extend” contract and pay damages of
$603,691.07 for the electricity bought by Hino for delivery during the term of
the “Blend and Extend” contract.[3] 
Hino subsequently amended its petition to add Constellation and CP&L as
defendants, alleging that Constellation and CP&L tortiously interfered with
existing contracts between Hino and the City by persuading the City to breach
its contract with Hino.  Despite its allegations, Hino did not clearly specify which
contract it claimed Constellation and CP&L interfered with.

            In August 2009, the matter
was tried to a jury.  After Hino rested its case-in-chief, the trial court
granted directed verdicts in favor of Constellation and CP&L and entered a
take-nothing judgment against Hino on August 26, 2009.  Within thirty days of
the trial court’s signing of its final judgment, Hino filed a motion for new
trial arguing that there is a material fact issue as to Constellation and CP&L’s
“intent and knowledge of the interference at issue in this cause,” and thus,
these fact issues should have been submitted to the jury and not decided by
directed verdict.  See Tex. R.
Civ. P. 329b(a) (providing that a motion for new trial shall be filed
within thirty days after the complained-of judgment or order is signed). 
Hino’s motion for new trial, however, was overruled by operation of law.  See
id. at R. 329b(c).  This appeal ensued. 

II.           
Standard of Review

In reviewing a trial court’s directed
verdict or judgment as a matter of law, we conduct a legal-sufficiency analysis
of the evidence.  City of Keller v. Wilson, 168 S.W.3d 802, 823 (Tex.
2005).  Evidence is legally sufficient if:

the evidence at trial would enable
reasonable and fair-minded people to reach the verdict under review.  Whether a
reviewing court begins by considering all the evidence or only the evidence
supporting the verdict, legal-sufficiency review in the proper light must
credit favorable evidence if reasonable jurors could, and disregard contrary
evidence unless reasonable jurors could not.

 

Id. at 827.  Moreover, in reviewing a directed verdict, we
consider all the evidence presented at trial, viewing it in the losing party’s
favor as much “as the record allows.”  S.V. v. R.V., 933 S.W.2d 1, 8
(Tex. 1996); see Szcepanik v. First S. Trust Co., 883 S.W.2d 648, 649
(Tex. 1994); see also Rodriguez v. United Van Lines, Inc., 21 S.W.3d
382, 383 (Tex. App.–San Antonio 2000, pet. denied).

            A court may grant a
directed verdict “if no evidence of probative force raises a fact issue on the
material questions in the suit.”  Prudential Ins. Co. of Am. v. Fin. Review
Servs., Inc., 29 S.W.3d 74, 77 (Tex. 2000); see Szcepanik, 883
S.W.2d at 649.  When no evidence of probative force on an ultimate fact element
exists, or when the probative force of the evidence is so weak that only mere
surmise or suspicion is raised as to the existence of essential facts, the
trial court has a duty to instruct the verdict.  Villarreal v. Art. Inst. of
Houston, Inc., 20 S.W.3d 792, 796 (Tex. App.–Corpus Christi 2000, no pet.);
see Exxon Corp. v. Breezevale Ltd., 82 S.W.3d 429, 443 (Tex. App.–Dallas
2002, pet. denied).

Essentially, there are two specific
situations in which a defendant should be granted a directed verdict:  (1) when
the plaintiff fails to offer probative evidence of an essential element of the
claim; or (2) when the plaintiff “admits or the evidence conclusively
establishes a defense to the plaintiff’s cause of action.”  Prudential Ins.
Co. of Am., 29 S.W.3d at 77.  However, a reviewing court may affirm a
directed verdict if the trial court’s rationale for granting the directed
verdict is erroneous, provided it can be supported on another basis.  Exxon
Corp., 82 S.W.3d at 443; Kelly v. Diocese of Corpus Christi, 832
S.W.2d 88, 90 (Tex. App.–Corpus Christi 1992, writ dism’d w.o.j.).

III.          
Analysis

In its sole issue on appeal, Hino
asserts that the trial court improperly granted directed verdicts in favor of
Constellation and CP&L because the record contains probative evidence to
raise fact issues on Hino’s claims.  Specifically, Hino argues that the record
contains evidence that:  (1) Hino and the City had a valid and existing energy
contract—the “Blend and Extend” contract; (2) Constellation and CP&L
intentionally interfered with that contract by submitting price quotes to the
City; (3) such interference caused the City to terminate the “Blend and Extend”
contract; and (4) caused Hino to sustain a contractual loss of $540,000 and
$220,000 in lost profits.  We disagree.

A.   Applicable Law

To establish a tortious-interference-with-an-existing-contract
claim, the plaintiff must show:  (1) that an existing contract subject to
interference existed; (2) a willful and intentional act of interference with
the contract; (3) that proximately caused the plaintiff’s injury; and (4)
caused actual damages or loss.  See Prudential Ins. Co. of Am., 29
S.W.3d at 77 (citing ACS Invs., Inc. v. McLaughlin, 943 S.W.2d 426, 430
(Tex. 1997)).  On the other hand, the elements of tortious interference with prospective business
relations are:  (1) a reasonable probability that the plaintiff would have
entered into a contractual relationship; (2) an independently tortious or
unlawful act by the defendant that prevented the relationship from occurring;
(3) the defendant did the act with a conscious desire to prevent the
relationship from occurring or with knowledge that the interference was certain
or substantially certain to occur as a result of his conduct; and (4) the
plaintiff suffered actual harm or damage as a result of the interference.  See
Ash v. Hack Branch Distrib. Co., 54 S.W.3d 401, 414-15 (Tex.
App.–Waco 2001, pet. denied); see also Finlan v. Dallas Indep. Sch. Dist.,
90 S.W.3d 395, 412 (Tex. App.–Eastland 2002, pet. denied). 

B.   Constellation’s Involvement

The record reflects that Constellation
was not awarded the contract to provide the City with electricity for the 2007
calendar year; instead, Hino’s contention that Constellation intentionally
interfered with Hino’s “Blend and Extend” contract with the City is premised
solely on the fact that Constellation submitted price quotes to the STAP that
were lower than those provided by Hino.  Joshua Hansel, a senior director for
Constellation, testified that, if a customer requests a price quote, Constellation
representatives usually will ask the customer when their current contract
expires or when the pricing should begin.  Constellation did not ask the City
about any pending contracts with other providers because Constellation
transacted through the STAP.  Hansel stated that there is nothing wrong with
the customer obtaining price quotes from energy providers even though the
customer is under contract with another provider.  When Constellation gave the
STAP price quotes to pass along to the City, Hansel did not have any knowledge
of Hino’s “Blend and Extend” contract with the City.  He denied ever directly
contacting the City to “get their business.”  

Hansel recalled that the STAP informed
him that the City requested pricing information from ten or twelve different
providers; that six providers responded to the request; and that the offers
submitted by CP&L and Constellation were the final ones considered by the
City.  Hansel stated that it is “standard procedure to respond to this request
for pricing knowing that the customer has an existing contract . . . .  Because
the request is made for pricing as represented by the customer starting when
their current contract expires.”  By waiting to negotiate until after the
current contract expired, the customer “could miss the best time to lock in a
price” and “the lights would go out if you couldn’t get a deal done at the end
of the year, and you don’t want to risk that.”  Hansel also noted that energy
providers typically rely on the representations of customers as to when their
contracts expire.[4] 
Finally, Hansel stated that Constellation did not intend to interfere with
Hino’s contract, and that Constellation did not intend for the City to breach
any existing contracts.  Hansel further stated that Constellation found out
about Hino’s “Blend and Extend” contract after litigation commenced.

First, based on the record before us,
we cannot say that Constellation interfered with the “Master Power Sales
Agreement” that Hino had with the City or that the City breached the
agreement.  It is true that the “Master Power Sales Agreement” was in effect at
the time the price quotes were solicited from Constellation.  However, Alex
Hinojosa Jr., President and Chief Executive Officer of Hino, admitted that the
City honored its obligations under the “Master Power Sales Agreement” and that
Hino was paid all money due under the agreement.  In fact, Hinojosa testified
that, when Hino tried to bill the City in October 2006 under the reduced rate
provided by the “Blend and Extend” contract, the City:  (1) repeatedly notified
Hino that the “Blend and Extend” contract had been terminated, (2) indicated
that the billing of electricity for the duration of the 2006 calendar year
should correspond with the “Master Power Sales Agreement”, and (3) remitted
full payment in accordance with the “Master Power Sales Agreement.”

To the extent that Hino argues that
Constellation’s act of providing lower price quotes induced the City to
terminate the “Blend and Extend” contract and, thus, constituted a tortious
interference with contractual relations, we note that the record contains no
evidence that Constellation was aware of the “Blend and Extend” contract at the
time the price quotes were offered.  For Constellation to be liable for
tortious interference in this case, Hino was required to prove that
Constellation had knowledge of the contract with which it was allegedly
interfering and that Constellation intentionally interfered with such
contract.  See Sw. Bell Tel. Co. v. John Carlo Tex., Inc., 843 S.W.2d
470, 472 (Tex. 1992) (holding that “[i]nterference with a contract is tortious
only if it is intentional”); Frost Nat’l Bank v. Alamo Nat’l Bank, 421
S.W.2d 153, 156 (Tex. App.–San Antonio 1967, writ ref’d n.r.e.) (concluding
that a defendant must have had actual knowledge, rather than merely actual
notice, that his conduct would interfere with performance under an existing
contract); Steinmetz & Assocs., Inc. v. Crow, 700 S.W.2d 276, 277-78
(Tex. App.–San Antonio 1985, writ ref’d n.r.e.) (“One element of a cause of
action for interference with contract or business relation is that the
interferer had actual knowledge of the contract or business relation in
question, or knowledge of facts and circumstances that would lead a reasonable
person to believe in the existence of the contract or business relationship.”);
see also Restatement (Second) of
Torts § 766 cmt. i (1979) (“To be subject to liability under the rule
stated in this Section[,] the actor must have knowledge of the contract with
which he is interfering and of the fact that he is interfering with the
performance of the contract.  Although the actor’s conduct is in fact the cause
of another’s failure to perform a contract, the actor does not induce or
otherwise intentionally cause that failure if he has no knowledge of the
contract.”). 

Hansel testified that Constellation
transacted through the STAP rather than directly with the City, and, because
the STAP was involved, the City must have been transacting for a period when no
contract would be in effect.  Hansel and Hinojosa both testified that it is
customary in the energy industry for retail energy providers to rely on the
representations of customers with regard to whether an existing contract is in
effect at the time the price quote is provided.[5] 
It is also noteworthy that, as Hinojosa acknowledged, Hino entered into the
“Master Power Sales Agreement” with the City in October 2004 using practices
similar to those used by Constellation—i.e., by providing price quotes to the
City even though the City was under contract at the time with another energy
provider.

Furthermore, “merely inducing one of
the parties to exercise his right to terminate contractual relations after
giving the required notice does not necessarily constitute tortious
interference with contract under Texas law.”  Juliette Fowler Hones, Inc. v.
Welch Assocs., Inc., 793 S.W.2d 660, 667 (Tex. 1990).  In other words, a party must be more
than a willing participant; he must knowingly induce one of the contracting
parties to breach its obligations.  See Browning-Ferris, Inc. v. Reyna,
865 S.W.2d 925, 927 (Tex. 1993); John Paul Mitchell Sys. v. Randalls Food
Mkts., 17 S.W.3d 721, 731 (Tex. App.–Austin 2000, pet. dism'd
w.o.j.); see also Arabesque Studios, Inc. v. Academy of Fine Arts Int'l Inc.,
529 S.W.2d 564, 568 (Tex. Civ. App.–Dallas 1975, no writ) (holding that a
plaintiff must show that defendant caused the interference, and it is not
enough that defendant reaped an advantage of a contract broken by the breaching
party's own volition).  The record in this case demonstrates that the City
validly terminated the “Blend and Extend” contract in accordance with its
terms.  Thus, there is no evidence that the City breached any contractual
obligations owed to Hino.

Based on the
foregoing, we conclude that Hino failed to raise any fact issue as to its tortious
interference claims against Constellation; in particular, the record contains
no evidence that Constellation intentionally interfered with any contract or
that Constellation committed any independently tortious or unlawful act that
prevented a probable contractual relationship between Hino and the City from
occurring.  See Ash, 54 S.W.3d at 414-15; Prudential Ins. Co. of Am., 29 S.W.3d at 77.  We therefore hold
that the trial court properly directed verdict in favor of Constellation.  See City of Keller, 168 S.W.3d at 823; Finlan, 90
S.W.3d at 412.

C.   CP&L’s Involvement

With respect to CP&L, the record
shows that Cordoba cold-called the City on October 26, 2006.  Cordoba testified
that she was motivated to contact the City about electricity prices after
reading a story in the local newspaper that documented the City’s negotiations
with Hino about future electricity prices.  Cordoba further testified that she
always asks a potential customer when their contract is up for renewal before
she quotes the customer electricity prices, which is a standard industry
practice.  When Cordoba cold-called the City, she was directed to the City
Attorney, who informed her that the City was indeed looking for a new
electricity provider.  The City Attorney also informed Cordoba that the City
was not under contract for 2007, and authorized Cordoba to analyze the City’s
historical usage information.  Ultimately, CP&L provided the City with a
competitive price quote, and the parties entered into a contract covering the
2007 calendar year, which was signed on November 1, 2006.  When contacting the
City about its electricity needs, Cordoba relied upon the City Attorney’s
representation that the City was not under contract for 2007.  Cordoba noted
that at the time the cold-call was made, she was completely unaware of the
“Blend and Extend” contract.  She presumed that the City was under contract
with another provider for 2006; thus, she did not offer to provide electricity
for the 2006 calendar year.

Cordoba, on behalf of CP&L, did
not offer to provide electricity for the 2006 calendar year and, thus, did not
interfere with the “Master Power Sales Agreement.”  Further, it was undisputed
that the City did not breach the “Master Power Sales Agreement” and had, in
fact, paid Hino for electricity consumed for the duration of the agreement.  See
John Paul Mitchell Sys., 17 S.W.3d at 730 (“Texas courts have held that to
satisfy [the “willful and intentional act of interference”] element of the
cause of action for tortious interference, a party must be more than a willing
participant; it must knowingly induce one of the contracting parties to breach
its obligations.”) (citing Reyna, 865 S.W.2d at 927).  Regarding the
“Blend and Extend” contract, CP&L offered to provide the City with electricity
on October 26, 2006, almost one month after the City had validly terminated the
“Blend and Extend” contract.  Thus, at the time of the cold-call, there was no
contract between Hino and the City with which CP&L could interfere.  See
Prudential Ins. Co. of Am., 29 S.W.3d at 77; Exxon Corp. v. Allsup,
808 S.W.2d 648, 654 (Tex. App.–Corpus Christi 1991, writ denied) (“A cause of
action for interference with contractual relations requires evidence of the
existence of a contract that is subject to the alleged interference.”); see
also Juliette Fowler Homes, Inc., 793 S.W.2d at 666 (“Until a contract is
terminated, it is valid and subsisting, and third persons are not free to
tortiously interfere with it.”) (citing Sterner v. Marathon Oil Co., 767
S.W.2d 686, 689 (Tex. 1989); Restatement
(Second) of Torts § 766 cmt. g); Davis v. HydPro, Inc., 839
S.W.2d 137, 139 (Tex. App.–Eastland 1992, writ denied) (“Merely entering into a
contract with a party with knowledge of that party’s contractual obligations to
someone else is not the same as inducing a breach.  It is necessary that there
be some act of interference or of persuading a party to breach, for example by
offering better terms or other incentives, for tort liability to arise.”).

Based on the
foregoing, we conclude that Hino failed to raise any fact issue as to its
tortious interference claims against CP&L; in particular, the
record contains no evidence that CP&L
intentionally
interfered with any contract or that CP&L
committed
any independently tortious or unlawful act that prevented a probable
contractual relationship between Hino and the City from occurring.  See Ash,
54 S.W.3d at 414-15; Prudential
Ins. Co. of Am., 29
S.W.3d at 77. 
We therefore hold that the trial court properly directed verdict in favor of CP&L.  See City of Keller, 168 S.W.3d at 823; Finlan, 90 S.W.3d at 412.

We overrule Hino’s
sole issue on appeal.

IV.         
Conclusion

The judgment of the trial court is
affirmed.

 

________________________

DORI CONTRERAS GARZA

Justice

 

 

Delivered
and filed the 

19th
day of May, 2011.









[1]
Hino attempted to persuade the City to agree to the “Blend and Extend” option
for a period of several years; however, the City Attorney notified City Council
members that the City could not enter into a contract with Hino exceeding one
year.  Thus, the City Council members agreed to a nine-month “Blend and Extend”
option.  And, to ensure that the “Blend and Extend” option was legal, the City
Attorney drafted the contract.  Though the City agreed to the “Blend and
Extend” contract on April 26, 2006, the parties did not sign the contract until
June 27, 2006.





[2]
On appeal, Constellation states that RFPs “are intended to operate as offers,”
whereas an “‘indicative price quote’ does not act as an offer, but as a mere
indication of the price for which energy might be purchasable during a given
period.”

 





[3]
The record demonstrates that Hino’s claims against the City were severed from
its claims against Constellation and CP&L, and summary judgment was then
granted in favor of the City.  The City is not a party to this appeal.





[4]
On cross-examination, Hansel admitted that Constellation could have filed an
open-records request with the City to see their contracts with Hino; however,
Hansel argued that such actions are not typically done; that the providers
usually rely on the representations of the customer regarding the terms of
existing contracts; and that the energy providers are not positioned to give
legal advice to customers about the terms of their existing agreements.  In
fact, even Alex Hinojosa Jr., President and Chief Executive Officer of Hino,
testified that he relies on the representations of government officials
regarding the expiration of existing contracts and does not make an
open-records request each time a municipality requests a bid from Hino.  In
addition, Hansel referenced a standard contract that Constellation issues,
which includes a clause requiring the customer to warrant that no existing
agreements are in effect during the time period covered by the Constellation
contract. 





[5]
In addition, included as an exhibit is a copy of the contract Constellation
typically used with customers in similar situations as this.  The Constellation
contract requires the customer to, among other things, warrant that the
contract does not interfere with other existing contracts.