**W. D. WHALEN et al., Appellants,**

**v.**

**H. J. WEAVER et al., Appellees.**

**No. 15636.**

Court of Civil Appeals of Texas, Houston (1st Dist.).

Nov. 27, 1970.

Rehearing Denied March 4, 1971.

Fulbright, Crooker, Freeman, Bates & Jaworski, B. J. Bradshaw, Larry D. Knippa, Houston, Kelley, Looney, McLean & Alexander, Ralph L. Alexander, Travis Hiester, Edinburg, for appellants.

Jim S. Phelps, Houston, for appellee H. J. Weaver.

William H. Scott, Jr., Houston, for appellees L. R. Garrett and Mausoleum Sales Company, Inc.

BELL, Chief Justice.

This suit was brought by H. J. Weaver against Mausoleum Sales Company, L. R. Garrett, W. D. Whalen, individually and doing business as Acme Finance Company, T. B. Weekly, Paul Wagner and Helen Spencer. Suit was on a promissory note in the amount of $12,000.00 payable to Weaver, executed by Sales Co. It was payable out of the realized profits of Sales Co. to be derived from the sale of crypts in a mausoleum that was to be constructed for the McAllen Cemetery Association in McAllen, Texas. Garrett personally had guaranteed 40% of the note. Recovery was sought against all of the defendants, other than the Sales Co., on the theory that they had all conspired to take over, and had taken over, all of the assets of Sales Co. Weaver also sought recovery against Whalen for slander. Sales Co. and Garrett, by way of cross-action, sought to recover from the other defendants double the amount of usurious interest that Sales Co. had allegedly paid Whalen on a note of $100,000.00 that Sales Co. had given Whalen for money to be advanced that was to be used in payment of a part of the construction costs of the mausoleum. Garrett, at all material times, owned all of the stock of Sales Co. Garrett's theory was that all other defend-

ants had conspired to take over, and did take over, all of the assets of Sales Co. Garrett sought recovery from such defendants actual and exemplary damages by reason of the taking over of said assets.

The judgment, based on a jury verdict, and a finding by the court of the amount of usurious interest allegedly paid, allowed the following recoveries:

1. A judgment for Weaver for the full amount of the note and interest against Sales Co., Whalen, Weekly, Wagner and Spencer. Alternatively, if this was not paid, recovery of 40% was allowed against Garrett.

2. Judgment in favor of Weaver against Whalen in the amount of $15,000.00 as damages for slander.

3. Judgment against Whalen, Wagner, Weekly and Spencer in favor of Garrett for $54,998.60, being double the amount of usurious interest allegedly shown to have been paid Whalen. The defendants allegedly conspired with Whalen to charge such interest.

4. Judgment in favor of Garrett against Whalen, Wagner, Weekly and Spencer in the amount of $110,000.00 as actual damages resulting from the conspiracy.

5. Judgment in favor of Garrett against Whalen, Wagner, Weekly and Spencer as exemplary damages in the amount of $125,000.00.

While the cross-action makes Weaver a cross-defendant and alleges he was a co-conspirator, there is absolutely no evidence that he was a party to any act asserted as showing a conspiracy or in furtherance thereof and no issue as to Weaver being a co-conspirator was submitted to the jury.

Whalen, Wagner, Weekly and Spencer appeal.

Whalen is a man with varied business interests in and around McAllen in the Rio Grande Valley area. He was owner of Whalen Furniture Company and Acme Finance Company. He was on the board of directors of the McAllen Cemetery Association which operated Roselawn Cemetery. He became president of the board of the Association sometime in 1960. He was a man of considerable financial means.

Weekly was the nephew of Mrs. Whalen and worked in the Whalen Furniture Store, handling credit. In 1961 he was about 27 years of age.

Wagner was general manager of Whalen's furniture store. He had worked for Whalen about 20 years. He was a brother to Mr. Whalen's brother-in-law, Elmer Wagner. M. L. Wagner, who was originally a party defendant, but who was dropped from the suit upon her death, was a sister of Whalen.

Spencer had previously worked full time as bookkeeper for Whalen's furniture store and continued to work part time at times material to this case.

Acme Finance Company was wholly owned by Whalen at all times material to this case though at one time relatives of his owned a very small interest. Acme is really an assumed name under which Whalen does business. The company was started about 30 years ago for the purpose of handling the purchase of commercial obligations owned by the Furniture Company and by outsiders. This included purchase of such obligations at discount. At the time of trial Whalen stated its net worth was around a quarter of a million dollars.

By a contract dated February 1, 1961, Whalen agreed to furnish a line of credit to Garrett's wholly owned Mausoleum Sales Company in an amount not to exceed $100,000.00. This was to provide funds to pay a part of the construction costs of a mausoleum to be constructed by Garrett for the McAllen Cemetery Association. Pursuant to such contract Sales Co. executed its promissory note to Whalen in the above amount. It was payable on demand. The money was to be advanced by Whalen from time to time to pay the contractor who was building the mausoleum and the money so paid was to bear interest

at the rate of 6½ percent per annum from the date advanced. The February 1 contract also provided the Sales Co. would execute its note for $30,000.00 payable to Weekly as brokerage. No interest is provided for in this note. The evidence clearly shows, and the jury found, that the execution of this $30,000.00 note was required by Whalen before he would advance the construction loan. The evidence and jury finding clearly show that this requirement was a charge made *solely* for the use of money advanced as the construction loan. These findings made the loan usurious.

No attack is made on these findings nor is any contention made that the contract was not usurious. Appellants assert that the maker of a note that provides for usurious interest may treat the part of the contract providing for interest void as to interest and pay only the principal by relying on Article 5071, Vernon's Ann.Tex.St., or, the maker may pay *usurious* interest and, upon the payment of the principal and interest in excess of 10%, may sue to recover double the amount of interest paid by resorting to Article 5073, V.A.T.S. Appellee Garrett seems to contend that double the amount of all interest paid may be recovered simply because the contract is usurious even though no interest in excess of 10% was actually paid.

■ We understand the rule to be as asserted by appellants. Though the contract be usurious because it provides for more than 10% interest per annum over the life of the loan, the maker may recover double the amount of interest paid *only* if he actually paid interest in excess of 10% and the lender has actually received it. Jennings v. Texas Farm Mortgage Co., 124 Tex. 593, 80 S.W.2d 931 (Tex.Com.App.—opinion adopted); Gunter v. Merchant, 213 S.W. 604 (Tex.Com.App.); Temple Trust Co. v. Haney, 103 S.W.2d 1035 (Tex.Civ.App., Austin), aff'd by S.Ct., 133 Tex. 414, 107 S.W.2d 368, 126 S.W.2d 950; Commerce Trust Co. v. Best, 124 Tex. 583, 80 S.W.2d 942 (Tex.Com.App.—opinion adopt-

ed); Adleson v. B. F. Dittmar Co. 124 Tex. 564, 80 S.W.2d 939 (Tex.Com.App.—opinion adopted); Gulf Coast Investment v. Prichard, 438 S.W.2d 658 (Tex.Civ.App., Dallas), n. r. e.; Thompson v. Kansas City Life Ins. Co., 102 S.W.2d 285 (Tex.Civ.App., Waco), writ ref.

In this case no issue was submitted to the jury seeking a determination of the amount of interest paid and received. In the judgment it is recited that it appeared to the court that Garrett was entitled to an additional judgment "for usurious interest in double the amount of *the interest actually paid* * * * since it appears to the Court that * * * Whalen *charged* in excess of 10% per annum for the use of the $100,000.-00 construction loan. Since the amount of the *interest paid* amounts to $27,499.30, then double the amount of interest equals the sum of $54,998.60." Apparently the trial court took the view that if the contract provides for usurious interest the maker may recover double the amount of any interest paid even though the amount actually paid in any year does not exceed the legal rate. (Emphasis ours unless otherwise stated.)

In such conclusion the trial court was in error as the cases we have above cited show.

It remains to determine whether Garrett or Sales Co. actually paid, or there was paid on their behalf, to Whalen interest in excess of the legal rate. We have reached the conclusion that there is no evidence of usurious interest having been paid. In this connection we note that it was contemplated by the parties that the total cost of the mausoleum would exceed $100,000.00. Sales Co. was to pay the entire costs of construction. Garrett and Sales Co. had no substantial funds and it was contemplated that these funds would be raised through the sale by Sales Co. of crypts. Under the contract with the Association, Sales Co. had the right to sell 80% of the crypts. Most sales were made on installment contracts. These were

pledged to Wagner and Weekly, Trustees, to secure the two notes above described by the contract of February 1, 1961. The two contracts of March 1, 1961 in tenor transferred all of Sales Co.'s rights under the contract of Gene Loewy Construction Co. to the Trustees and employed Sales Co. as an independent contractor to make sales on commission. The Loewy contract had been assigned to Sales Co. with the consent of the Association. Under the Leowy contract Loewy was to build the mausoleum at his expense and was entitled to sell 80% of the crypts. These March 1 contracts purported to make Sales Co. an independent contractor for the sale of the crypts on commission. The Trustees assumed Sales Co.'s obligations in the construction of the mausoleum. However, one of them showed the right of Garrett to the proceeds of the sale of 80% of the crypts after the payment of the two notes and all construction costs not paid by the $100,000.00 loan. A January 19, 1962 contract dealt with the lettering for the crypts and made Sales Co. an independent contractor to sell such on commission. Also Sales Co. rights were to terminate on January 1, 1963. These last three contracts gave the Trustees the effective control over all collections and disbursements. At the end of the evidence and before submission to the jury, the parties stipulated that the intention of the parties in the execution of these March and January contracts created the legal relationship between the parties in the nature of a mortgage or security device as distinguished from a sale of assets.

The evidence shows that after the March 1 contracts, all books were turned over to the Trustees and were thereafter kept by them or their representative.

The $100,000.00 note was transferred by Whalen to Acme Finance Co.

■ Defendants' Exhibit 2 shows the dates and amounts of advances made to the Trustees by Acme Finance Co. on the $100,000.00 loan. They began March 14, 1961, and ended February 12, 1962.

They aggregate $99,155.73. Defendant and Cross-Plaintiff's Exhibit 22 shows the dates and amount of payments credited by the Trustees on the $100,000.00 note. The evidence in the record shows that as the money was available through collection on the contracts from the sale of crypts some of these contracts being discounted on purchase by Acme, payments were made to the Trustees and credited on the principal until the principal had been paid. The notes made no provision as to how payments were to be credited. Neither Garrett nor Sales Co. through any representative directed how payments should be credited. In such case payments may be credited to principal. Community Savings and Loan Association v. Fisher, 409 S.W.2d 546 (Tex.). The appellants in their brief have prepared a table which lists the dates of payment on the $100,000.00 note, the amount paid and the balance due on principal after payment as shown by Defendants' Exhibit 3 and Defendant and Cross-Plaintiff's Exhibit 22. The accuracy of the table has not been challenged by appellees. It shows that by applying the payments to principal, as was done, the principal would be paid on October 23, 1968.

This table shows the first payment on the Whalen note was made April 6, 1962 and the last was made October 23, 1968, which sufficed to pay the principal.

■ By taking, as shown by the evidence, the amount of the various advances on the loan, their dates, the amount and dates of each repayment, we can determine the amount of unpaid principal on a given date and the interval of time that elapsed before the next payment. If we take each amount and apply 10% interest to it for the interval of time that it was owed, we can determine the amount of interest that would have been earned during such interval at the rate of 10% per annum. A table has been prepared by appellants in their brief, which is not challenged by appellees, and which we

find to be correct, which reflects in figures what we have stated immediately above in this paragraph. We will illustrate by giving the first four lines of the table:

| Interval | Unpaid Principal during Interval | Number of Days of Interval | Earning during Interval at 10% Per Annum | Accrued Interest at 10% Per Annum |
|---|---|---|---|---|
| 3–14–61–4–10–61 | $29,392.56 | 27 | $220.44 | |
| 4–10–61–5–10–61 | 32,322.56 | 30 | 269.35 | $ 489.79 |
| 5–10–61–8–12–61 | 35,322.56 | 94 | 922.31 | 1,412.10 |
| 8–12–61–9–11–61 | 36,627.36 | 30 | 305.22 | 1,717.32 |

Carrying out this process until the principal of the loan was repaid, the amount of interest that was earned at the rate of 10% per annum amounts to $36,856.62. The court found that the amount of interest "actually paid" was $27,499.30. The result is that no interest in excess of 10% was actually paid.

Appellee Garrett in his effort to show usurious interest was paid seeks to include what Acme Finance Co. received when it discounted various installment contracts belonging to Sales Co. Too, he seeks to include the reserve set up by Acme in addition to the discount. These may not be included as interest. Garrett contemplated that the cost of construction would exceed $100,000.00 and he proposed to raise this additional amount through the sale of the crypts allotted to Sales Co. It appears that there was need to raise money by discounting the contracts to meet Garrett's financial obligations under the construction contracts. Garrett specifically agreed to by far most of the transfers at discount. This is nothing but a normal business practice. It was in fact suggested by Acme in connection with a major portion of such contracts that they be discounted elsewhere. There is nothing in the record to show that the discount and reserves were not the normal ones that would have been taken.

Appellant Whalen asserts it was error to allow Weaver to recover $15,000.00 as damages for slander from him.

The evidence shows that in 1965, after this suit was originally filed, Whalen apparently orally complained to the District Attorney of Hidalgo County about three checks Weaver had written in 1960. These checks were those of Sales Co. signed by Weaver. Unquestionably the evidence supports the conclusion that Weaver, who at the time they were written was connected with Sales Co., was authorized to write the checks. It is undisputed that the checks were properly written for Sales Co. business. Weaver was subpoenaed to appear before the Hidalgo County grand jury. Whalen appeared before that body. Whalen, while in the hallway of the courthouse, in the presence of Weaver's attorney, Garrett's attorney, the Assistant District Attorney, and several unnamed and unknown parties called Weaver many vile names, threatened to report him to the Internal Revenue Bureau and accused him of embezzling company funds and of being a thief. The jury found that Whalen accused Weaver of embezzlement.

Weaver lived in Houston. He had a fine reputation in "his" community. Nothing is shown about Weaver's connection with the Valley area.

Whalen urges there is no evidence that Weaver suffered any damages and the utterances were made under such circumstances that he could have suffered none, or in any event he could have suffered no more than nominal damages. He also urges it was error to give judgment for $15,000.00 because under the circumstances this amount found by the jury was the result of passion, prejudice and improper influence.

■ A crime was imputed to Weaver and this is slanderous per se. Buck v. Savage, 323 S.W.2d 363 (Tex.Civ.App.,), ref. n. r. e.; Libel and Slander, 36 Tex.Jur.2nd, Section 7, and authorities there cited.

■ In a case where a charge imputed is slanderous per se no special damages need be alleged or proven. Substantial as distinguished from nominal damages may be recovered. West Texas Utilities Co. v. Wills, 164 S.W.2d 405 (Tex.Civ.App.,), n. w. h.; Belo & Co. v. Wren, 63 Tex. 686. The amount of damages is peculiarly within the province of the jury. It is true that this Court has authority to require a remittitur if it deems the damages awarded clearly excessive. Damages sustained are purely personal and cannot be measured by any fixed rule or standard. Beaumont, S. L. & W. Ry. Co. v. Daniels, 204 S.W. 481 (Tex.Civ.App.,), writ ref.; Hooker v. Ft. Worth Press, 11 S.W.2d 586 (Tex.Civ.App.,) n. w. h.; El Paso Times v. Eicke, 292 S.W. 594 (Tex.Civ.App.,) dism'd; Eidinoff v. Andress, 321 S.W.2d 368 (Tex.Civ.App.,), ref., n. r. e. We are unable to say under the facts of this case that the damages were the product of passion or prejudice or that they are excessive.

■ Appellant urges Weaver did not plead Whalen falsely accused him of embezzlement but plead that he threatened to report Weaver to the Internal Revenue Bureau. However, without objection evidence of the imputation of embezzlement was admitted. The issue was submitted to the jury without any objection. There was therefore trial by consent. Rule 67, T.R.C.P.

The pleadings of Weaver charge a conspiracy between Garrett, Whalen, Weekly, Wagner and Spencer to appropriate the assets of Sales Co. to Whalen. The pleadings of Sales Co. and Garrett make the same allegation against Weaver, Wagner, Whalen, Weekly and Spencer.

The jury in answer to Special Issue No. 2 found that *before* February 1, 1961, a conspiracy came into being, one of the purposes of which was to enrich Whalen out of the assets of Sales Co. Other issues found Whalen, Wagner and Weekly were parties to the conspiracy and that Spencer became a party to the conspiracy. The jury found in answer to Issue No. 10 that in furtherance of the conspiracy Whalen had prepared and executed the contracts dated February 1, 1961, March 1, 1961 and January 19, 1962. It also found in answer to Issue No. 11 there was no consideration for the two contracts dated March 1, 1961. It failed to find in answer to issue that no consideration passed for the January, 1962 contract. In answer to Issue No. 15 it found that $110,000.00 would compensate Garrett for damages resulting from the conspiracy. In answer to Issue No. 17 exemplary damages in the amount of $125,000.00 were assessed.

Appellants assert there was no evidence of a conspiracy to wrongfully appropriate the assets of Sales Co. and the court therefore erred in rendering judgment against them for $110,000.00 actual damages resulting from a conspiracy. Appellants' approach is that the most that can be said is that there was a conspiracy (they do not admit there actually was one) to charge and collect usurious interest and in such case the only damages collectible from the conspirators would be the usurious interest collected and there was no such interest collected.

■ In the case of Schlumberger Well Surveying Corporation v. Nortex Oil & Gas Corporation, 435 S.W.2d 854, 856, our Supreme Court stated the rule applicable to a suit for damages based on a civil conspiracy. It stated the rule thus:

"A civil conspiracy has been found by this court as a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means * * * [b]ut the gist of the civil conspiracy is that damage resulting from the commission of the wrong which injures another, and not the conspiracy itself."

We are of the view that the only evidence of any conspiracy prior to February 1, 1961, is to charge and collect usurious interest. As we have shown above, no such interest was collected.

In asserting a conspiracy to enrich Whalen out of the assets of Sales Co., appellees apparently rely on what they term unlawful acts. Such acts most heavily relied on by appellees are not unlawful ones.

We will not detail all facts. However, we have closely read 1400 page statement of facts and the 61 exhibits.

In September, 1959, Gene Loewy Construction Company entered into a contract with McAllen Cemetery Association for the construction of a mausoleum at the expense of Loewy. Under it Loewy was to have the right to sell 80% of the crypts and to retain the proceeds except for $15.00 for each crypt that was to be placed in the perpetual care fund of the cemetery.

In 1960 Sales Co., a corporation, was organized by Garrett and Weaver, Garrett owning 40% of the stock and Weaver 60%. The corporation had no substantial assets. Weaver planned to finance the construction. Weaver's $12,000.00 note was given by Sales Co. to obtain funds to purchase the Loewy contract. It was payable out of the profits to be realized from the project. Weaver later decided to get out of the project and Loewy became owner of his interest. Loewy later sold his stock to Garrett so that at all times involving arrangement for financing Garrett owned 100% of Sales Co. stock. The assignment of the Loewy contract was approved by the Association. Loewy was a contractor and planned the construction of the mausoleum.

Garrett, a salesman, had no substantial assets so he set about to arrange the financing. It was estimated the cost would be about $150,000.00. He contacted Leon Radinsky who agreed to furnish $100,000.00 with interest at the rate of 6%. However, this advance was to be handled by Radinsky calling on the McAllen State Bank to issue its certificate of deposit and draw a draft for this amount on Radinsky's Houston bank. Under the arrangement with Garrett, Radinsky was, in addition to interest Garrett was to pay, to receive the interest paid on the deposit. The bank refused to handle the matter in this manner because it was highly irregular. There is absolutely no evidence that any of the alleged conspirators had anything to do with the bank's action.

Garrett next contacted a Mr. Dunning, a contractor, who would construct the mausoleum and Garrett would pay him 6½ percent interest on the cost of construction and Dunning in addition would be entitled to 35% of the proceeds of the project or, if he elected, the sum of $25,000.00. The evidence shows, however, this was an oral proposal that was never finalized because there were some instruments, the nature of which is not clear to us, that Garrett was to get which were never gotten. The evidence leaves no doubt that no final agreement had been reached.

Garrett in the meantime had been making advance sales of crypts and after negotiations returned to McAllen. There he came in contact with Whalen who asked him about his financing. Garrett told him about the prospects in Houston. Whalen stated the financing could be done in the Valley by his getting ten local people to put up $10,000.00 each to loan Garrett and the 35% or $25,000.00 could go to the perpetual care fund. Garrett's understanding was that Whalen's proposal would be equal in cost to him, that is 6½ percent interest on the $100,000.00 and the 35% of profits or $25,000.00. Garrett knew the sales contracts for crypts would be hypothecated to secure the payment of these amounts. It developed that the ten men who would loan the money could not be found and Whalen orally agreed to do so personally. All of these negotiations occurred in the summer of 1960.

Mr. Rike, an architect, prepared the plans and specifications. Andis and Brunson became the contractors, the contract being let September 1, 1960 and work commenced about December 1.

Work on the contract to evidence the loan was being worked on by attorneys for Whalen. It was signed February 1, 1961. It created a usurious loan in that it provided for a note of $30,000.00 to Weekly as brokerage when no such service was performed. The contract also pledged the installment contracts for crypts sold by Garrett. The contract was in line with Garrett's understanding as is shown by his letter of January 26, 1960, to Weekly and Wagner giving an account of the crypt contracts as of January 26, 1960. The letter shows they were pledged to secure construction costs of some $155,000.00 and the $30,000.00 brokerage note.

When the first contractor's estimate came due, two March 1 contracts were signed before Whalen would advance the money to cover it. One contract employed Garrett as independent contractor to sell crypts. The other assigned the crypt contracts to Wagner and Weekly. However, we think the record shows they were at all times treated as mortgages and all parties stipulated they were so intended. We have previously mentioned the discounts to Acme and others and find them to be usual and customary. Garrett was given the opportunity to have them discounted with someone other than Acme.

 The result is that we hold there is no evidence of a conspiracy to enrich Mr. Whalen out of the assets of Sales Co. The only evidence of a conspiracy is to charge and collect usurious interest. No damages resulted from such.

We reverse the judgment of the trial court insofar as it awarded Weaver recovery on his note against appellees. We reverse the judgment in favor of Garrett against appellants awarding $110,000.00 actual and $125,000.00 exemplary damages. Since the record shows the case was fully developed on the conspiracy theory, we render judgment that no recovery be had on the conspiracy theory. However, we reverse and remand the case for trial on Sales Co.'s and Garrett's plea for an accounting. This for the reason that it was plead and it was stipulated that the right to an accounting would be waived only if a judgment awarding damages for conspiracy became final. This includes Weaver's right to recover judgment on his note out of any realized profits.

We reverse and render judgment awarded against appellants for alleged usurious interest collected, we having found as a matter of law no such interest was collected.

We affirm the judgment of the trial court awarding Weaver $15,000.00 for slander.