**Vernon GLENN, Appellant,**

v.

**Gene GIDEL et al., Appellees.**

**No. 8341.**

Court of Civil Appeals of Texas, Amarillo.

April 16, 1973.

Phillip D. Hardberger, San Antonio, for appellant.

Culton, Morgan, Britain & White, Donald E. Jackson, Amarillo, Leo C. Michaud, Bardwell D. Odum, Dallas, for appellees.

REYNOLDS, Justice.

In this lawsuit, plaintiff Vernon Glenn sought monetary damages from Gene Gidel and the American National Bank of Amarillo for slander, and from H. R. Gibson, Sr., and Gibson Products Company for slander, interference with a contract, and for wrongful cancellation of his Gibson franchises. Trial began before a jury and, after plaintiff had presented his evidence, all defendants moved the trial court to, and the court did, instruct a verdict favorable to all defendants. Judgment was entered accordingly. Plaintiff's three-point appeal challenges the propriety of the trial court's instructed verdict and judgment. Affirmed.

The first point of error asserts that the instructed verdict was erroneous because the evidence raised material issues of fact for resolution by the jury. The other two points assigned error in excluding certain evidence offered. A statement is necessary to properly posit the events leading to a consideration of the points of error.

*The Events Preceding Litigation*

H. R. Gibson, Sr., sometimes hereinafter referred to as Gibson, is the owner of the trademark names "Gibson Products Company" and "Gibson Discount Center." Plaintiff Vernon Glenn and his brother, J. B. Glenn, were interested in establishing a Gibson discount store in Amarillo. Gibson would not consider granting them a Gibson franchise unless they could establish a line of credit of at least $200,000.00. The Glenn brothers made arrangements with the American National Bank of Amarillo in April, 1964, to borrow $200,000.00 to open and operate the store. The business was incorporated as Gibson Products Company of Amarillo with each brother owning 50,000 shares of stock, or fifty per cent of the total of the 100,000 shares of stock issued. A second store was opened in May or June in 1965. Subsequent to the April, 1964 transaction, the bank made loans to the Glenn brothers and the corporation for inventory and working capital purposes. In February, 1967, the outstanding indebtedness was consolidated into a $300,000.00 note, fifty percent of which was guaranteed by the Small Business Administration. One of the executed loan documents obligated the Glenn brothers to furnish to the bank or the Small Business Administration a semi-annual audit beginning June 30, 1967, and the year-end audit was to be certified.

Subsequent to the establishment of both stores, the Glenn brothers and H. R. Gibson, Sr., doing business as Gibson Products Company of Seagoville, Texas, executed two written agreements dated August 31, 1965. The two instruments were identical except for the number of the Glenn brothers' store for which the agreement was executed. By the material terms of the agreement, Gibson permitted the Glenn brothers the use of his registered trademark names in Amarillo for the period of ten years, and the benefit of volume purchasing power for which the Glenn brothers agreed to pay, depending upon the size of the store, either $150.00 or $200.00 per

month. The contract specified that it was not assignable or transferable without the written approval of Gibson, and the only provision for cancellation contained in the agreement was the penultimate paragraph which reads:

"This contract may be cancelled at any time within *Ninety (90) Days* by written notice sent registered mail, by either party."

On July 31, 1968, Tony Grillo, formerly employed by the Glenn brothers as a bookkeeper, went to the office of Gene Gidel, the vice-president of the American National Bank servicing the loan made to the Glenn brothers. At that time, the Glenn brothers had failed to submit, and the bank had not received, the certified audit due December 31, 1967. To Gidel, Grillo made certain statements concerning his problems with keeping the books and records of inventory for the corporation and the movement of merchandise between the stores. Gidel invited Garner Young, the Small Business Administration representative who was in Amarillo on business, and W. P. McWhirter, a certified public accountant retained by the Glenn brothers to prepare an audit, to the bank where Grillo repeated the report he previously had made to Gidel. This was done, Gidel testified, because ". . . this . . . could have all tied in with the reason why we could not get a certified statement." The next morning, Gidel related Grillo's report to five members of the bank's loan committee.

According to Gidel, and he was the only witness called to testify about Grillo's report, the report Grillo made to him, and repeated at Gidel's request to Young and McWhirter, and then communicated by Gidel to the bank's loan committee members concerning the movement of merchandise was:

". . . there was a movement of merchandise from one store to the other, or other locations, that he could not account for. . . ."

Gidel also testified that Grillo had told him that ". . . there evidently was some movement at night." Parenthetically, it is noted that additional to the stores other buildings were used periodically as warehouses, and neither of the Glenn brothers knew whether the merchandise therein had been included in the year-end inventory. Approximately a week after the Grillo report an additional report came to Gidel and he approached Vernon Glenn. According to Vernon Glenn's version of the conversation, Gidel took the information to mean that the Glenn brothers were stealing truck loads of mortgaged merchandise out of the store at night.

Thereafter, the Glenn brothers entered Gidel's office when Gidel was engaged in a telephone conversation. Gidel addressed the party as "Mr. Gibson" and, concluding the conversation, stated to the Glenn brothers, "I just called Mr. Gibson to see what's going on." Plaintiff could not state that Gidel was talking with H. R. Gibson, Sr., nor the nature of the conversation.

Approximately one or two weeks later, the Glenn brothers were notified by registered letter dated November 14, 1968, from Gibson's attorney that Gibson ". . . has elected to cancel and terminate . . . each of the . . . franchise agreements dated August 31, 1965, said cancellation and termination to be effective ninety (90) days from receipt of this notice by you." Within thirty days thereafter, following negotiations with prospective purchasers of the stock, the Glenn brothers sold their shares of stock in Gibson Products Company of Amarillo to Bill Johnson and Raymond Akin. Some sixty days later, Vernon Glenn instituted this lawsuit.

### Plaintiff's Allegations

Plaintiff Vernon Glenn founded his cause of action for slander against Gene Gidel and the American National Bank of Amarillo on allegations that Gidel, in his capacity as a bank officer, maliciously circulated a false report about plaintiff's honesty. The alleged report was that plaintiff

and his brother were wrongfully removing truck loads of merchandise from the store at night.

The causes of action presented against H. R. Gibson, Sr., and Gibson Products Company were for slander, contractual interference and wrongful franchise termination. The slander complaints were that Gibson, to whom Gidel allegedly communicated the false report of which he is accused, wrongfully circulated the story to other people, including prospective buyers of plaintiff's business interest, and falsely stated that plaintiff's business books were erroneous and not reflective of the true financial condition of the stores. Contractual interference was charged "(f)or wrongfully interfering with the contract between Vernon Glenn and the buyers of his store." In response to a special exception and with approval of the court, plaintiff added the following: "Gibson did this by telling the Hookers, O'Kelly, Chaffins, Johnson and Akin that the store was not worth the money they were offering, and he didn't want them to pay that." Plaintiff went to trial on this allegation. The franchise cancellation was pleaded to be wrongful in violation of the implied good faith continuance of the contract.

All of these acts by the defendants, plaintiff concluded, illegally forced him to sell his business interest at a loss. Punitive damages for plaintiff's loss of character, reputation, and standing in the community were also sought.

### The Actions for Slander

#### 1. Against Gidel and the Bank

From the foregoing major premises, plaintiff contends that he made out a submissive case of slander by Gidel and the bank for jury resolution. It is reasonable to infer, plaintiff says, that Gidel and the bank were guilty not only of slander but of slander per se in accusing plaintiff of the crime of stealing mortgaged merchandise, and publishing the accusation to Young, McWhirter, the bank's loan committee

members and to Gibson. We do not accord that interpretation to the evidence.

■■ To constitute actionable slander, there must be a defamatory statement orally communicated or published without legal excuse; the statement must be actionable per se, that is, defamatory in itself, or actionable per quod, that is, not actionable per se upon its face, but actionable only in view of actual damages resulting from slanderous words. McDaniel v. King, 16 S.W.2d 931 (Tex.Civ.App.—San Antonio 1929, no writ). See, also, the cases collated at 36 Tex.Jur.2d Libel & Slander § 2.

■■ Aside from any question of the legal excuse of privileged communication interposed by Gidel and the bank, the statement of Grillo communicated by Gidel was not a defamatory statement per se applicable to plaintiff. The statement does not name any person, and particularly it does not designate Vernon Glenn, in connection with the movement of merchandise. It does not charge the commission of any crime. The record is devoid of any evidence of the meaning given to the communicated words by any of the persons to whom the report was published. The communication to a third party must be in such way that the third party understood the words in a defamatory sense; and, absent any proof upon the issue that at least one hearer understood the words in the defamatory sense, there is no actionable publication of slander. Montgomery Ward & Co. v. Peaster, 178 S.W.2d 302 (Tex.Civ. App.—Eastland 1944, no writ). It is consistent with the evidence in this record that the words were accepted in the context of the difficulty Grillo said he experienced in keep the inventory records rather than in the context of imputing a crime to plaintiff.

■■■ Plaintiff testified that in his conversation with Gidel, Gidel accused plaintiff and his brother of stealing merchandise from the store. This accusation imputed to plaintiff the crime of theft and it is slanderous per se, Whalen v. Weaver,

464 S.W.2d 176 (Tex.Civ.App.—Houston [1st Dist.] 1970, writ ref'd n.r.e.); but, the slander is actionable only if it is published to one or more third persons without legal excuse. That statement is not shown to have been overheard by or communicated to a third party and, in the absence of any evidence of publication, it is not actionable. Lyle v. Waddle, 144 Tex. 90, 188 S.W.2d 770 (1945).

■ Plaintiff argues that the totality of circumstances raises the inference that, and requires a jury determination of whether, Gidel communicated the slanderous statement accusing plaintiff of theft to Young, McWhirter, the bank loan committee members and Gibson. Considered in the light most favorable to plaintiff, if the evidence raises reasonable inferences in favor of his contention, the instructed verdict would be improper. White v. White, 141 Tex. 328, 172 S.W.2d 295 (1943). However, we have concluded that a reasonable inference supporting plaintiff's contention is not presented by the evidence.

■ Plaintiff introduced through Gidel's testimony the Grillo statement that Gidel testified he communicated, and no witness contradicted this testimony. Then plaintiff testified about the accusatory statement Gidel made to him, but he did not state that the accusation was declared to be based on Grillo's report; in fact, the evidence is that Gidel did not approach plaintiff until he had received a report from another source subsequent to the time he communicated the Grillo report. Gidel denied publication of any statement other than the one quoted by Grillo, and there is no testimony by any recipient that a different statement was communicated. As a general rule, the uncontradicted testimony of an interested witness merely raises an issue of fact for determination by the trier of the facts because the credibility of the witness is involved; but, if that uncontradicted testimony is clear, positive, unequivocal and free from suspicion, and the opposing party had the means and opportunity of dis-

proving the testimony if it were not true and fails to do so, the issue is taken as established as a matter of law. Bartsch v. Ruby, 229 S.W.2d 105 (Tex.Civ.App.—San Antonio 1950, mand. overr.). Plaintiff introduced no testimony from any of the persons to whom Gidel said he communicated Grillo's report, or from Gibson, to whom plaintiff pleaded that Gidel had relayed a false report. If Gidel's testimony were not true, the plaintiff had the means and opportunity to disprove it by presenting the testimony of one or more persons who received the Gidel report, and particularly by the testimony of his own accountant, McWhirter. Plaintiff did not utilize these sources of evidence, and no reason is shown for the failure to do so.

■ Had the evidence been presented to a jury, the jury, as the judge of the credibility of the witnesses and the weight to be given to their testimony, would have been privileged to believe plaintiff and to disbelieve Gidel; but, by disbelieving Gidel's uncontradicted testimony, the jury would not have been authorized to find the contrary as a fact absent testimony to support such finding. R. T. Herrin Petroleum Transport Co. v. Proctor, 161 Tex. 222, 338 S.W.2d 422 (1960). Moreover, had the jury found from the evidence that Gidel's communication did impute the commission of a crime to plaintiff, the finding could have been predicated only on surmise, suspicion or conjecture, because the evidence of actionable slander is no more than a scintilla which, in law, is no evidence. University of Texas: Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, 38 Tex.L.R. 361; Paris & M. P. R. Co. v. Russell, 104 S.W.2d 650 (Tex. Civ.App.—Eastland 1937, no writ).

■ It is the duty of the court to determine as a question of law what constitutes defamatory language. Butler v. Central Bank & Trust Company, 458 S.W.2d 510 (Tex.Civ.App.—Dallas 1970, writ dism'd). Since the evidence established that the statement Gidel communicated was

not slanderous, and that the slanderous statement plaintiff stated Gidel made to him was not published, the trial court correctly determined that there were no unresolved material fact issues for jury determination in regard to these allegations of slander. On this phase of the case, the trial court properly instructed a verdict.

## 2. Against Gibson and Gibson Products Company

The efficacy of the judgment operative on that portion of the instructed verdict in favor of, and foreclosing plaintiff's declared cause of action for slander against H. R. Gibson, Sr., and Gibson Products Company has not been challenged in this appeal. There is no connective point of error in that under none of the three points is there any recitation or discussion of the factual circumstances, or any citation of authority, or any argument made relational to this aspect of the proceeding. Consequently, plaintiff has relinquished any review of this phase of the case, Bowen v. East Texas Hospital Foundation, 400 S.W.2d 843 (Tex.Civ.App.—Tyler 1966, writ ref'd n. r. e.), and it will not be further noticed.

### Excluded Evidence

Before considering further the first point of error in regard to whether the evidence raised material fact issues requiring jury resolution of whether Gibson wrongfully interfered with plaintiff's contractual relations and illegally cancelled the franchises, it is necessary that the validity of the second and third points be determined. The two points assert error in excluding from the jury certain testimony developed on voir dire examination outside of the jury's hearing. The evidence concerned, respectively, plaintiff's negotiations with prospective purchasers of his business interest and the impeachment of Gibson's deposition testimony.

### 1. Chaffin Negotiation

Plaintiff offered his own testimony in regard to his business dealings with a Mr. Chaffin and his sons, none of whom was called to testify. In substance, plaintiff's testimony was that the Chaffins had offered $125,000.00 to J. B. Glenn for his one-half interest. This offer was rejected by J. B. Glenn. The Chaffins made the same offer to Vernon Glenn for his one-half interest which was refused. Gibson then allegedly suggested to the Chaffins that they pay only $90,000.00 for each interest, but thereafter the Chaffins renewed their original offer which both of the Glenn brothers refused. Plaintiff claimed that what made him "definitely sure" that he did not want to sell his interest was a statement by Gibson to the effect that Gibson was interested in buying one-half of the interest. Upon the offer of this testimony in its entirety, it was objected to and rejected by the court. The trial court's rejection was proper, for evidence of an unaccepted offer to purchase, made by one not a party to the suit, is inadmissible to show the value of the property to be sold. This would place before the jury hearsay declarations of third parties. Stone v. Payne, 168 S.W.2d 503 (Tex.Civ. App.—Beaumont 1942, no writ). Plaintiff then proposed to limit the testimony to the introduction of the transaction without reference to price, but the testimony would still include the irrelevant offers made to J. B. Glenn, and was properly objected to for irrelevancy. Again, although part of the testimony was admissible, the trial court properly rejected the offer in entirety. It is mandatory that counsel for the offeror select the admissible portions and submit them separately. Hanover Insurance Company v. Peyson, 373 S.W.2d 701 (Tex.Civ.App.—Fort Worth 1963, no writ).

### 2. Hooker-O'Kelly Negotiation

Plaintiff also offered his own testimony concerning his negotiations with a

Mr. Hooker, through his son, Jim Hooker, and his son-in-law, Herschel O'Kelly, for the sale of plaintiff's business interest. Again, the testimony of Mr. Hooker, Jim Hooker or Herschel O'Kelly was not offered. In brief, plaintiff stated that he was offered $125,000.00 for his one-half interest in the business. He testified that Gibson talked with the Hookers and caused them to retract their offer. The testimony of this negotiation contained hearsay interspersed throughout the recitation to which an objection was lodged. The plaintiff did not offer to limit this testimony to the admissible portions or to segregate the admissible from the inadmissible testimony, and the trial court correctly rejected the en masse offer. Hanover Insurance Company v. Peyson, supra.

### 3. *Johnson-Akin Negotiation*

The final offer of testimony within the confines of the second point of error concerns the negotiation leading to the sale of plaintiff's shares of stock to Bill Johnson and Raymond Akin. The testimony offered was that of plaintiff and no testimony from Johnson or Akin was adduced. Plaintiff testified that Johnson and Akin combined their resources and offered to buy his one-half stock interest for $125,000.00. He stated that Johnson later said:

". . . Fellows, I just don't know . . . I have talked to Mr. Gibson about it before I came up, and he said I'm crazy, that I can get it for nothing, that he just gave you three people to sell the store to and the other two have backed out and that I can just get the store for nothing. I told him those boys have done a lot of work and have worked real hard getting this store started and getting it going, and he told me, he said, 'Well, but they don't have any idea what they owe; they don't know what they have got, and you can just get the store for nothing,' and said he just won't okay me getting the franchise if I pay this money for it."

This testimony, together with similarly related testimony, was offered to prove the interference of Gibson with the sale, plaintiff then testifying that the final offer, which he accepted, was only $15,000, although his tax return introduced in evidence shows that he reported the sale of his shares of stock for the sum of $65,969.48. Obviously, the testimony is replete with hearsay; it contains statements made out of court offered for the truth of the matters asserted. The testimony not only contained an offer but the amount of the offer additional to interference by Gibson. Although the court indicated to counsel that some of the proffered testimony was admissible, no attempt was made to segregate the admissible portion and, upon the objection to hearsay, the court properly rejected the offer of testimony in its entirety. Hanover Insurance Company v. Peyson, supra.

### 4. *All Negotiations*

Finally, plaintiff submits that all of the above referred to testimony is admissible to establish his cause of action for interference with a contractual relationship. In support of this proposition, plaintiff cites Cooper v. Steen, 318 S.W.2d 750 (Tex. Civ.App.—Dallas 1958, no writ). There, the plaintiff introduced the evidence of the offer and the interference with the offer by the person who made the offer, and the advent of hearsay was not involved. The holding is not applicable here for the reason that the testimony offered was hearsay and appropriately rejected. 1 McCormick and Ray, Texas Evidence § 781 (2d Ed. 1956). The second point of error is overruled.

### 5. *Impeachment Testimony*

■ Plaintiff introduced that portion of the deposition testimony of Gibson to the effect that Gibson had never made any allegations to anybody about the price that should be paid for the Glenn brothers' stock. Outside the presence of the jury,

plaintiff offered his own testimony that Gibson did discuss the price that Chaffin should pay for J. B. Glenn's stock. Upon objection, plaintiff's testimony was not allowed to go before the jury. The court's rejection ruling was correct. The attempted impeachment is on a collateral matter and, as such, is inadmissible. Christie v. Brewer, 374 S.W.2d 908 (Tex.Civ.App.— Austin 1964, writ ref'd n. r. e.); 1 McCormick and Ray, Texas Evidence § 690 (2d Ed. 1956). The third point of error is overruled.

### The Action for Contractual Interference

■■■■ Further considering the initial point of error, a careful perusal of plaintiff's pleadings on which he went to trial compels the conclusion that his pleaded cause of action concerning interference was one for contractual interference as opposed to interference with business relations. He pleaded that Gibson and Gibson Products Company " . . . are liable to the Plaintiff in . . . an action for . . . interference with the contract . . . in the following ways: (5) For *wrongfully interfering with the contract between Vernon Glenn and the buyers of his store . . . .*" The general rule, stated from the cases noted at 33 Tex.Jur. 2d Interference § 3, is that for there to be a right of action against one for contractual interference, there must be in existence a valid contract subject to that interference. At the times of the interference charged against Gibson, this record shows no contract to have been executed between plaintiff and Johnson and Akin, "the buyers of his store." Thus, plaintiff failed to prove contractual interference by Gibson in this respect.

■■■■ Plaintiff submits, however, that the exception to the general rule applies here. The exception cited by plaintiff is the one stated in Cooper v. Steen, supra, that it need not be absolutely certain that the prospective contract would have been made sans interference but, under all the circumstances, a reasonable assurance thereof is sufficient. Assuming arguendo that the exception applies here, or that the trial amendment language—"Gibson did this by telling the Hookers, O'Kelly, Chaffins, Johnson and Akin that the store was not worth the money they were offering, and he didn't want them to pay that"—sufficiently pleaded interference with business relationships, and that the evidence raised the issue, we must then apply the further language of plaintiff's cited Cooper v. Steen, supra, 318 S.W.2d at p. 757, reading:

> " . . . It must appear, in order that the conduct may be tortious, that damage has been occasioned thereby; . . . "

Excluding the properly rejected evidence of offers made to plaintiff, this record is devoid of any evidence of damage sustained by plaintiff as the result of the sale of his shares of stock. The record contains plaintiff's testimony that he sold his shares of stock for $15,000.00; however, there is no testimony by anyone as to the value of the shares nor any admissible evidence of the price for which plaintiff could have sold his stock to a willing purchaser. Plaintiff's tax return reporting the sale of his 50,000 shares of stock for $65,969.48, shows his cost or basis in the shares to be $14,627.45, an amount less than he testified he received for the shares of stock. Therefore, plaintiff failed to offer any evidence on one of the essential elements of his cause of action, and the instructed verdict was correctly given on this aspect of the case.

### The Action for Franchise Cancellation

■■■■ Lastly, under his first point of error, plaintiff contends that the evidence is sufficient to support his action for the wrongful cancellation of his franchise by Gibson. It is plaintiff's position that the language of the agreement providing for cancellation " . . . at any time within *Ninety (90) Days* by written notice . . . . " means cancellation can only be effected within ninety days from execu-

tion of the agreement, and that the cancellation thereafter was plainly against the ten year term provided in the agreement. We do not agree. There is no contention that the written franchise agreements did not embody the complete franchise agreement between the parties. Plaintiff did not allege the agreement, or the cancellation provision, to be ambiguous, nor that there was any fraud or mistake involved. Under these circumstances, the language of the agreement will be construed in its ordinary meaning. Bales v. Jones, 288 S.W.2d 266 (Tex.Civ.App.—Fort Worth 1956, writ ref'd n. r. e.). There being no ambiguity, the construction of the agreement is a question of law for the court; the instrument must be viewed in its entirety to ascertain the intent of the parties as shown by the facts, the context of the agreement and the circumstances. Myers v. Gulf Coast Minerals Management Corp., 361 S. W.2d 193 (Tex.1962). Neither the entire view of the instrument nor the factual circumstances surrounding the execution of, and the operation under, the franchise agreements support plaintiff's assertion. Plaintiff's construction would require the court to add the qualifying phrase "from the date of execution" after the phrase "Ninety (90) Days." This addition would violate the construction rule of giving the language its ordinary meaning. The term "Ninety (90) Days" was inserted on a blank line in the agreement. If it were the intent of the parties that cancellation be limited to the first ninety days of the term of the agreement, it would have been an easy matter to so state. The agreements were executed more than fourteen months after the first store was established and some ninety days after the second store was operative either under, or in anticipation of receiving, the franchises. Thereafter, when Gibson gave notice of cancellation long after the first ninety days from the date of the agreements, plaintiff did not protest the notice, and introduced no testimony as to the intent of the parties respecting the cancellation provision. Without protesting the cancellation, plaintiff sold his stock before the effective date of the cancellation notice, and made no issue of the cancellation until this suit was filed. The construction placed on the agreements by the parties is that cancellation could be effected at any time during the ten year period by written ninety days notice given by either party, and not within the first ninety days after the agreements were executed. Moreover, if cancellation could not be effected after the first ninety days, then neither party would be able to cancel the agreement during the entire ten year period irrespective of the non-performance by the other party. Obviously, this intendment is not a logical conclusion to be drawn from viewing the agreement in its entirety. Under all the circumstances, we hold that no fact issue was raised by the evidence as to the wrongful cancellation of the franchise agreements, the cancellation notice being within the terms of the agreements.

We have considered all the facets of plaintiff's first point of error under the rule relating to instructed verdicts. Having so considered the point, it is overruled.

The judgment is affirmed.